624 So.2d 1239 (1993)
Prentiss E. SMITH, M.D.
v.
OUR LADY OF THE LAKE HOSPITAL, INC. d/b/a Our Lady of the Lake Regional Medical Center, Kenneth C. Cranor, M.D., A. Foster Sanders, M.D., Donald R. Cowick, M.D., W. Howard Kisner, M.D., M.J. Rathbone, Jr., M.D., Louis P. Laville, Jr., M.D., B. Eugene Berry, M.D., W. Redfield Bryan, M.D., Mr. Sidney Duplessis, Mr. W.H. LeBlanc, Jr., Mr. Roland Toups, Mr. Robert Davidge, and Others Whose Identities and/or Roles are Unknown to Plaintiff at this Time.
No. 91 CA 2253.
Court of Appeal of Louisiana, First Circuit.
August 31, 1993.
Rehearing Denied August 31, 1993.[*]
*1240 Kevin P. Monahan, Baton Rouge, for plaintiff-appellant Prentiss E. Smith, M.D.
Lloyd J. Lunceford, Baton Rouge, for defendants-appellees Kenneth C. Cranor, M.D., D.R. Cowick, M.D., A.F. Sanders, M.D., W.H. Kisner, M.D., and L.P. Laville, M.D.
T. MacDougall Womack, Baton Rouge, for defendants-appellees OLOL Hosp., M.J. Rathbone, M.D., W.R. Bryan, M.D., S. Duplessi, W.H. Lelanc, R. Toups, and R. Davidge.
Leon Gary, Baton Rouge, for defendants-appellees E. Berry, M.D., D. Davis, M.D., C. Sheely, M.D., and CVT Surgical Center.
Before CARTER and LeBLANC, JJ., and CHIASSON,[1] J. Pro Tem.
CARTER, Judge.
This matter is on rehearing in an appeal from a trial court judgment granting a motion for summary judgment. On original hearing, this court reversed a trial court judgment granting defendants' motion for summary judgment and remanded the matter to the trial court for further proceedings. 612 So.2d 816. Thereafter, defendants' filed an application for rehearing.
Defendants filed a joint application for rehearing and made various assertions which warrant further discussion. Moreover, in their joint brief, defendants set forth various errors allegedly committed by this court in rendering our original opinion, which the court has determined need to be discussed.[2]

RELEVANCY OF PRECEDING FEDERAL COURT ACTION
In the original brief to this court, the defendants argued that "[t]he federal suit is very relevant to these proceedings, and an understanding of the relationship between the two suits is essential. Although the state petition substitutes an `antitrust count' for the federal `RICO count', in all other respects the two suits are identical." (emphasis supplied). The defendants' original brief also stated the following:
This state court is not bound as a matter of law by the federal ruling. However, appellees believe that after considering this parallel suit this Court will find the federal opinion, which imposed weighty sanctions on Dr. Smith for alleging factual assertions identical to those being asserted in this case, to be persuasive on the separate question here presented of whether there was a reasonable basis on which to rest the decision to terminate Dr. Smith's privileges. This is so because the federal decision was not premised on whether Dr. *1241 Smith had stated a cause of action under the RICO statute (as would have been the case had the federal court ruled on a 12(b)(6) motion to dismiss). Rather, the federal sanctions opinion addressed the more fundamental question of whether Dr. Smith's underlying factual allegations, duplicated verbatim in this state court action, had any evidentiary support or were in any way based on a reasonable pre-filing legal or factual inquiry. [The federal suit is also relevant to these proceedings for another reason: much of the present record on appeal is comprised of discovery depositions taken in the federal court proceedings.]
On the other hand, in their application for rehearing, the defendants argued that this court erred in "borrowing factually incorrect language from the tangentially-related U.S. Fifth Circuit opinion which is in no way dispositive of the issues here." (emphasis supplied).
Interestingly, at the time defendants filed their original brief when their position was that the federal case was so "relevant and essential" to the state court action, the federal district court had imposed sanctions against the plaintiff's attorneys. However, at the time that the application for rehearing was filed and the federal court action had, in defendants' opinion, become only "tangentially related" to the state court action, the federal appellate court had reversed the federal district court opinion on the issue of sanctions.
It is evident why defendants chose to argue diametrically opposed positions on the same issue when the court decisions changed in favor of the other party. However, it is difficult to comprehend defendants' eagerness to "chastise" this court in the application(s) for rehearing because of the court's usage of excerpts of the federal court opinion given defendants' position when they filed their original brief.
Our use of the questioned language did not purport to construe the federal court opinion as establishing uncontested facts which were binding on this court in the instant case. In the section of our original opinion entitled "Background," we used the language from the federal court opinion because it succinctly set forth the framework within which the instant matter arose. Nothing more, and nothing less should have been inferred from our usage of this language.

IMMUNITY FROM LITIGATION VERSUS IMMUNITY FROM LIABILITY
In original brief, defendants argued that the Louisiana qualified immunity statute should protect these defendants from the instant litigation, noting that "peer review participants are attacked through expensive retaliatory suits which result in vexatious and unnecessary litigation." The defendants also argued that the policy peer review immunity statutes are expressly designed to promote "shielding review participants from retaliatory litigation." Defendants contend that this policy "would be stymied if summary judgment could be avoided by the simple expedient of making conclusory allegations of `malice' and then arguing that a determination of `subjective' facts was required."
LSA-R.S. 13:3715.3 C sets forth the immunity with regard to peer review committee members and provides as follows:
No member of such committee shall be liable in damages to any person for any action taken or recommendation made within the scope of the functions of such committee if such committee member acts without malice and in the reasonable belief that such action or recommendation is warranted by the facts known to him. (emphasis added).
A cursory reading of the plain wording of the statute reveals that the legislative purpose in enacting these immunity statutes was not to protect reviewing participants from "litigation." Rather, the intent of the statute is to protect a member of a peer review committee from "liability in damages." Indeed, if the intent of the legislature had been to establish an immunity from "prosecution," as opposed to an immunity from liability, it would have been a simple matter of including the necessary language to accomplish this result. However, this was not done. Therefore, *1242 we are without the authority to shield the defendants from "litigation."
If it is established at trial that the requisite elements to invoke the immunity have been met, defendants will be entitled to the immunity from liability envisioned by the peer review immunity statutes. In that event, the intent of the legislature will have been fulfilled, and defendants will not be liable to plaintiff in damages.
However, defendants vehemence for their position seems to overlook another important concept in the law, namely, that a plaintiff is entitled to his day in court, unless the law requires otherwise. At this point in the proceedings and considering the record before us, we were reluctant, and still are, to terminate the plaintiff's case without requiring defendants to establish their entitlement to summary judgment. In our opinion, this was not done.

FAILURE TO REVIEW THE RECORD
In their original brief, defendants argued that "[i]n determining whether the provisions of R.S. 13:3715.3 apply to preclude liability, this Court is not required to engage in a de novo medical review. No analysis of the intricacies of cardiology or cardiovascular surgery is required. It is not incumbent upon the Court to review 3,000 pages of medical records." However, in their original application for rehearing, defendants complained that "the opinion of this Court is also in error in that the opinion evidences a failure to engage in a de novo evaluation of the record...."[3]
This court conducted a painstaking review, not a mere cursory examination, of the entire record in this matter on two occasions, once on original hearing and again on rehearing. Unfortunately, no matter how many times this record is reviewed, the legal requirements for entitlement to summary judgment and the proof, or lack thereof, contained in the record do not change. This court applied the law, as we understand it, to the facts of this case and rendered the judgment we believe was required by the law and the facts. The Louisiana Supreme Court may not agree with this decision and has the authority to reverse or modify this decision, which is entirely within their province. However, in rendering a decision, we, as a conscientious judiciary, do not yield to the whims of popularity or fear being reversed by a higher court. We render judgments which are just, legal, and proper based upon the record. We believe that our judgment rendered in this case was just, legal, and proper.

IMPLICATIONS OF DENIAL OF SUMMARY JUDGMENT
Defendants apparently fear that the denial of the motion for summary judgment in some manner forecasts the resolution of the trial on the merits. The resolution of this case, in its current procedural posture, depends on the propriety of the granting of the summary judgment. However, a denial of the summary judgment is in no way intended to be, nor is it, dispositive of the merits of Dr. Smith's case as to his entitlement or his lack of entitlement to damages from the members of the peer review committee. The sole legal issue before us is whether, based upon the record before us, summary judgment is appropriate under the facts and circumstances of the instant case.

PROPRIETY OF GRANTING SUMMARY JUDGMENT
As we noted in our original opinion, a motion for summary judgment is a procedural device to avoid a full-scale trial when there is no genuine factual dispute. Ouachita National Bank in Monroe v. Gulf States Land & Development, Inc., 579 So.2d 1115, 1120 (La.App. 2nd Cir.), writ denied, 587 So.2d 695 (La.1991). A motion for summary judgment should be granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. LSA-C.C.P. *1243 art. 966; Bercegeay v. Cal-Dive International, Inc., 583 So.2d 1181, 1183 (La.App. 1st Cir.), writ denied, 589 So.2d 1070 (La.1991); Robertson v. Our Lady of the Lake Regional Medical Center, 574 So.2d 381, 383-85 (La. App. 1st Cir.1990), writ denied, 573 So.2d 1136 (La.1991).
Material facts are those which are essential to the plaintiff's cause of action under the applicable theory of recovery and without which the plaintiff could not prevail. Material facts are those that potentially insure or preclude recovery, affect the litigant's ultimate success, or determine the outcome of a legal dispute. Penalber v. Blount, 550 So.2d 577, 583 (La.1989); Eads Operating Company, Inc. v. Thompson, 537 So.2d 1187, 1194 (La.App. 1st Cir.1988), writ denied, 538 So.2d 614 (La.1989).
The burden is upon the mover for summary judgment to show that no genuine issue of material fact exists, and only when reasonable minds must inevitably conclude that mover is entitled to judgment as a matter of law is summary judgment warranted. Robertson v. Our Lady of the Lake Regional Medical Center, 574 So.2d at 383-85. When the court is presented with a choice of reasonable inferences to be drawn from subsidiary facts contained in affidavits and attached exhibits, reasonable inferences must be viewed in the light most favorable to the party opposed to the motion. Ouachita National Bank in Monroe v. Gulf States Land & Development, Inc., 579 So.2d at 1120. The credibility of witnesses or doubt as to whether a party alleging a fact will be able to sustain his burden of proof on the merits are improper considerations in determining the existence of material fact. Johnson v. Slidell Memorial Hospital, 552 So.2d 1022, 1023 (La.App. 1st Cir.1989), writ denied, 558 So.2d 571 (La.1990). Nor is a motion for summary judgment generally[4] suitable for disposition of cases requiring a judicial determination of subjective facts such as motive, intent, good faith or knowledge. See Penalber v. Blount, 550 So.2d at 583; Ouachita National Bank in Monroe v. Gulf States Land & Development, Inc., 579 So.2d at 1120; Fogg v. Fogg, 571 So.2d 838, 842 (La.App. 3rd Cir.1990), writ denied, 575 So.2d 372 (La.1991); Morgan v. Campbell, Campbell & Johnson, 561 So.2d 926, 929 (La.App. 2nd Cir.1990); Rodgers v. Johnson, 557 So.2d 1136, 1138 (La.App. 2nd Cir.1990).
To reiterate, appellate courts review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. Schroeder v. Board of Supervisors of Louisiana State University, 591 So.2d 342, 345 (La.1991).
To determine whether the peer review committee members are entitled to qualified immunity from liability for the actions taken or recommendations made by them during the peer review process of Smith's performance, the trial court was required, as are we, to determine whether there are no genuine issues of material fact and whether reasonable minds must inevitably conclude that the peer review committee members acted "without malice and in the reasonable belief that such action or recommendation is warranted by the facts known to him."
Our renewed review of the record, which contains depositions taken in the federal court action as well as those taken in the instant litigation, reveals that this court was correct in its original position that the determination of whether defendants are entitled to the qualified immunity is not proper for summary judgment in the instant case. The record reveals the following deposition testimony and documentary evidence which we feel bears heavily on our finding that defendants did not establish their entitlement to application of the immunity as a matter of law and requires inquiry into the subjective motive and knowledge of the committee members in contravention of the jurisprudential prohibition against such inquiry on a motion for summary judgment.

*1244 A. REASONABLE BELIEF THAT THE ACTION OR RECOMMENDATION IS WARRANTED BY THE FACTS KNOWN TO HIM.
The record reveals the following:
On August 9, 1983, a meeting of the surgical/dental chief of services was held. The mortality list of surgical deaths for the months of June and July was reviewed, and no problems were reported. Dr. L.P. Laville, Jr., chief of surgical services at the Lake, noted that there were three deaths following coronary artery bypass surgery and that the Chief of Thoracic and Cardiovascular Surgery was surveying the mortality rates from this procedure.
On February 14, 1984, Dr. Berry reported the rates for the Thoracic and Cardiovascular Surgery Service for the period January, 1982 through June, 1983, and the members of the surgical/dental chief of services committee determined that further investigation was required.
On April 3, 1984, a joint meeting of the Cardiovascular Diagnostic Service and the Thoracic and Cardiovascular Surgery Service was held. The joint committee had been requested by the chief of staff to review Dr. Smith's death cases for three procedures and answer five questions.[5] The mortality statistics of the Thoracic and Cardiovascular Surgery for the three procedures in question during 1980 through 1983 were distributed for review, and Dr. Smith's death charts for January, 1982, through June, 1983 were available for review. Four cardiologists each reviewed several cases, including the medical records and cardia catheterization films and presented the case to the committee. Each of the four cardiologists answered affirmatively to the first three questions posed and rated the risk associated with the reviewed procedure from high to normal risk. The entire group then answered the posed questions, unanimously replying affirmatively to the first two questions. The vote on the third question was seven affirmative responses with four abstentions. After further discussion, the third question was answered affirmatively by eleven members with only one abstention. The group deferred voting on the final two questions in that a complete study of statistics by a statistician was required.
On May 1, 1984, in correspondence to Dr. Eugene Berry, the chief of staff requested the Thoracic and Cardiovascular Surgery Service to respond to the two final questions. The service responded negatively to whether Dr. Smith's death rates for the three procedures were within the limits of acceptable standards by a vote of five to one, with two undecided votes. The service responded negatively to whether Dr. Smith met the standard of practice of cardiovascular surgery for the community by a vote of six to one, with one undecided vote. The service also noted their concern that the data obtained from the eighteen-month review may not be truly representative of Dr. Smith's total experience.
In March of 1985, the Committee on Standards and Ethics of the Society of Thoracic Surgeons, which was composed of two cardiovascular surgeons and one cardiologist from different geographic areas concluded that the surgery performed by Dr. Smith appeared "not to be up to the acceptable standards of practice for the time interval involved."
Dr. Boyd E. Helm, cardiologist, testified that a non-cardiologist would not have the training to determine whether surgery in a heart patient was indicated even after viewing the films and speaking with the cardiologist or the patient. Dr. Helm referred his patients to both the Smith group and the Berry group. Of the patients he referred to *1245 Dr. Smith, a significant percentage of those patients were high risk.
During his dealings with Dr. Smith, Dr. Helm testified that Dr. Smith met the standard of care for practices in cardiovascular surgery and that the level of care exercised by Dr. Smith was not substandard. Dr. Helm served on the committee which reviewed twelve of Dr. Smith's cases on April 3, 1984, and did not find that Dr. Smith was below the standard of care.
Dr. John S. McClelland, internist and cardiologist, testified that, based on his experience, Dr. Smith was within acceptable standards of practice in cardiovascular surgery.
Dr. Thomas P. Quaid, internist, testified that it would be impossible to determine if surgery was indicated in a patient without looking at the films. Dr. Quaid testified that he did not know of one of his cases where Dr. Smith's surgery was not indicated. Dr. Quaid believed that Dr. Smith was an extremely qualified surgeon and that he had no reason to question Dr. Smith's skills. Nor could Dr. Quaid testify that Dr. Smith's medical knowledge was below the acceptable standard of practice. Dr. Quaid noted that Dr. Smith was willing to take on more difficult cases than other surgeons, which resulted in his statistical results.
Dr. Iqbal Ahmad, cardiologist, testified that it would be impossible to determine whether surgery was indicated without looking at the films. Dr. Ahmad observed that Dr. Smith was willing to perform surgery on higher risk patients. Dr. Ahmad testified that any surgery performed on his patients by Dr. Smith was indicated. Based on Dr. Ahmad's experience, Dr. Smith appeared to be performing a good job and his medical knowledge appeared to be adequate.
Dr. James R. Calvin, cardiologist, testified that review of the films were necessary for a surgeon to determine whether surgery was indicated. Based upon his experience with Dr. Smith, Dr. Calvin testified that the level of care administered by Dr. Smith was within acceptable standards of practice for a cardiovascular surgeon. With regard to review of a cardiovascular surgeon's performance, Dr. Calvin testified that he thought the practice of having a non-cardiologist and non-cardiovascular surgeon review the work of a cardiovascular surgeon was inappropriate.
Dr. V. Bibb Saye, cardiologist, testified that a non-cardiovascular surgeon could not provide a valuable opinion as to whether or not heart surgery is indicated in a patient. Dr. Saye noted that, while all of Dr. Smith's patients were not high risk, Dr. Smith did have a significant number of high risk patients.
Dr. T.R. Kilpatrick, Jr., cardiologist, testified that a decision could not be made as to whether heart surgery should be undertaken without a review of the films. Dr. Kilpatrick testified that a cardiovascular surgeon would be in a better position than a cardiologist to evaluate whether the standard of care of a cardiovascular surgeon had been met.
Dr. Kilpatrick and Dr. Smith worked on a considerable number of cases together. Dr. Kilpatrick testified that he had no problems with Dr. Smith's performance. The percentages of unsuccessful cases fell within what Dr. Kilpatrick felt was expected.
Dr. Alan V. Stansfield, a cardiovascular surgeon formerly associated with the Berry group, testified that the mortality rate between Dr. Berry's group and the Smith group appeared to be different, which gave him the impression that perhaps Dr. Smith was not providing the same quality of care.
Dr. James F. Woodard, cardiologist, testified that surgery is a team effort among the cardiologist, the cardiovascular surgeon, and the patient. In his deposition, Dr. Woodard related an incident in which he felt very strongly that one of his patients needed heart surgery and that she would not survive without surgery. Dr. Woodard consulted with the Berry group and was informed that the group preferred not to perform the surgery. Because of Dr. Woodard's persistent belief that surgical intervention was required, he consulted with Dr. Smith. Dr. Woodard and Dr. Smith agreed that the procedure was high risk, and, after consultation with the patient and her family, determined that the best alternative was to perform the surgery, which was successful. Dr. Woodard *1246 testified that he had no reason to believe that Dr. Smith's level of care was substandard.
Dr. Woodard participated in the April 3, 1984, review of a dozen cases and testified that there was not sufficient information available to the committee to determine that Dr. Smith's care was substandard. The committee believed that more information was necessary and that a statistician needed to review the statistics.
Dr. Leon F. Kraft, cardiologist, testified that between 1979 and 1983, he consulted with Dr. Smith on approximately seventy percent of his cases. Dr. Kraft testified that, in complex surgeries, there were special requests for Dr. Smith because of his skills. Dr. Kraft testified that, based on his experience, most of Dr. Smith's patients tended to be sicker than other patient populations. Dr. Kraft further testified that he would never make a decision of whether or not to perform surgery without looking at the films, nor could a decision be made as to whether surgery was indicated without review of the films.
Dr. Kraft testified that Dr. Smith's patients tended to be higher risk patients than those treated by the Berry group. Dr. Kraft testified that, in his experience with Dr. Smith, no surgeries which were not indicated were undertaken. Also, Dr. Kraft felt that Dr. Smith's surgical abilities were acceptable. In fact, Dr. Kraft testified that Dr. Smith had "excellent" technical skills. Dr. Kraft noted that one of his patients had been evaluated by physicians in two other locals and that surgery had been deferred because it was "technically difficult." However, Dr. Smith performed with surgery, and the functional capability of the patient dramatically improved. Dr. Kraft recalled that three of his patients who underwent surgery by Dr. Smith died. However, Dr. Kraft testified that the deaths were not attributable to any inadequate care on Dr. Smith's part.
Dr. Vernon L. McCord, anesthesiologist, testified that he worked with Dr. Smith on numerous occasions and found him to be a competent surgeon. Dr. McCord did not attribute a significance between Dr. Smith's patients and the Berry group's patients; however, Dr. McCord testified that Dr. Smith took some cases that other physicians would not take because of monetary considerations. Dr. McCord also indicated that Dr. Smith's surgical skills were excellent, noting that Dr. Smith "didn't have any wasted motions and was exact."
Dr. Charles D. Belleau, anesthesiologist, testified that Dr. Smith's technical skills as a surgeon were excellent and that Dr. Smith worked extremely well in emergency situations. In the course of his association with Dr. Smith, Dr. Belleau did not find that his technical surgical ability fell below the standard of practice of cardiovascular surgery. Dr. Belleau further testified that Dr. Smith's patients were more Medicare and Medicaid patients, whose financial resources were more limited and who were generally older.
Steven H. Eaton, perfusionist at the Lake, testified that Dr. Smith was a better technician than several of the other surgeons who performed surgery at the Lake. Moreover, Eaton stated that Dr. Smith appeared to know how to conduct myocardial protection and that the techniques used for myocardial protection at the hospital were basically uniform among the surgeons. Eaton further testified that Dr. Smith's patients were generally sicker than the patients on whom the Berry group operated. With regard to Dr. Smith's suspension, Eaton believed that, based upon his experience with Dr. Smith, there were no grounds to terminate Dr. Smith.

B. LACK OF MALICE.
The record reveals the following:
Dr. Helm testified that, from his experience with his patients, there was no reason for the Lake to have suspended Dr. Smith's privileges. Dr. Helm testified that he did not know why the executive committee had made the decision it did because, in his personal experience, the decision appeared arbitrary.
Dr. McClelland testified that he did not have any reason to believe that the defendants harbored any ill will or malicious intent towards Dr. Smith.
*1247 Dr. Quaid testified that, in his limited experience with Dr. Smith, he did not find any reason for the suspension or limitation of Dr. Smith's privileges at the Lake.
Dr. Ahmad testified that he knew of no reason why the Lake suspended Dr. Smith's surgical privileges.
Dr. Kilpatrick testified that he was "a little surprised that they really went after Prentiss because of his skills" because it was generally known that Dr. Smith's patients were generally sicker. With regard to the alleged competitive nature of Dr. Smith's relationship with the Berry group, Dr. Kilpatrick noted that it was not obvious, but was "just more subtle slander." Moreover, although Dr. Kilpatrick testified that he had no reason to believe that there was any ill will or malicious intent which motivated the peer review process, he did not have any reason to believe that ill will or malice was not the motivating factor behind the peer review process.
Without identifying any particular individuals, Dr. Stansfield acknowledged that people at two area hospitals, including individuals associated with the Berry group, conveyed to him that Dr. Smith did not perform the same quality of work as did the Berry group. Dr. Stansfield also testified that everyone in the Berry group had a personality difference with Dr. Smith.
Dr. Woodard testified that the committee received much criticism, indicating that the cardiologists had "copped out" on the decision. With regard to whether or not he was aware of any malice the defendants may have had against Dr. Smith, Dr. Woodard testified that, although he was not personally aware of anything, he had heard things that may or may not be true. Specifically, Dr. Woodard had heard that "all people on the Executive Committee were out to get Prentiss Smith."
Dr. Kraft testified that he first learned about Dr. Smith's suspension through the "rumor mill." Dr. Kraft participated in the committee meeting on April 3, 1983, which reviewed various of Dr. Smith's cases. The general sentiment about the committee's findings was that "the cardiologists bailed out on us."
Regarding the executive committee meeting, Dr. Kraft testified that the style of the meeting was that the data presented had been reviewed prior to the meeting and that "they made up their mind prior to the meeting." Dr. Kraft testified that, at the executive committee meeting, the matter appeared to be determined and he felt inhibited by the political process or the economic consequences of taking a stronger opposition. Moreover, Dr. Kraft gave very little credence to the Society's evaluation because of the small amount of time (a day or two) that the society spent on its review. Further, while Dr. Kraft was reluctant to testify that there were any improper motives during the proceedings, he felt that the matter could have been handled differently from a procedural point.
Dr. Belleau testified that he had heard about the suit among the parties and, although he had no reason to believe the allegations were true, he had no information which would lead him to conclude that they were not true. Dr. Belleau testified that, prior to Dr. Smith's suspension, he observed a certain degree of "competition" between Dr. Smith and the Berry group. Generally speaking, Dr. Belleau felt that there was some animosity between the groups.
In our opinion on original hearing, we pointed out two instances in which subjective motive and knowledge were determined to be inappropriate for summary judgment, citing Chelette v. Wal-Mart Stores, Inc., 535 So.2d 558, 560 (La.App. 3rd Cir.1988), writ denied, 537 So.2d 1170 (La.1989), and Fogg v. Fogg, 571 So.2d at 841-42. These cases were cited for illustrative purposes only and were not intended to be a regurgitation of Louisiana jurisprudence on the issue. We are cognizant of certain jurisprudence which determined that, under the facts of those cases, the general prohibition against deciding issues of subjective motive and knowledge on motions for summary judgment were inapplicable. See Simoneaux v. E.I. DuPont DeNemours, 483 So.2d 908 (La.1986); Neuberger v. Times Picayune, 597 So.2d 1179 (La. App. 1st Cir.1992); Carter v. BRMAP, 591 So.2d 1184 (La.App. 1st Cir.1992); and Benjamin v. First Horizon Insurance Company, *1248 563 So.2d 1337 (La.App. 3rd Cir.1990).[6] In most of these cases, the evidence was clear and uncontroverted as to the issue of subjective motive or knowledge. However, this factor was conspicuously absent from the record in the instant case.
In the instant case, a determination of whether defendants are entitled to the qualified immunity requires the trial court to determine the subjective motive and knowledge of the committee members. Although the evidence is not clear as to whether or not there was any malice and/or a lack of reasonable belief that the actions taken were warranted, there is substantial indication in the record that something other than Dr. Smith's alleged lack of surgical skills and/or his alleged substandard practices motivated the inquiry into his mortality statistics.

C. WEIGHING OF EVIDENCE AND DETERMINATION OF CREDIBILITY OF WITNESSES.
Moreover, as we noted on original hearing, the trial judge, in granting defendants' motion for summary judgment, weighed the credibility of the various witnesses whose affidavits or depositions were submitted in support of and in opposition to the motion for summary judgment. In his "Findings of Fact and Conclusions of Law," the trial judge discussed the depositions of four physicians and noted:
It appears that their participation was limited to attending one joint meeting in April of 1984 of the Cardiovascular Diagnostic Service and Thoracic and Cardiovascular Service Committee. Also, it appears that each of these doctors abstained from answering the questions of whether or not Dr. Smith's mortality rate was acceptable and whether or not he met the applicable standard of care. Their review was inconclusive and they all recommended further study. None of these doctors participated in or were privy to the additional review by the numerous Committees which later investigated Dr. Smith except for Dr. Craft who attended one additional meeting of the Executive Committee.
Although each has testified that they saw no problems with Dr. Smith's performance, they were careful to qualify their responses by noting the very limited nature of their April, 1984 twelve case review. The limited nature of these four doctors must be weighed against the more exhaustive analysis by committees which ensued during the following three years. They were not privy to the scope or nature of the additional peer reviews which were undertaken and could not render an opinion about whether the Hospital's ultimate decision to terminate plaintiff's privileges was warranted. (emphasis added).
Further, the trial judge's "Findings of Fact and Conclusions of Law," reveal that he improperly considered the credibility of witnesses in determining the existence of material fact, noting that:
In Dr. Waldhausen's affidavit, ... he states that "... At no time did any representative of Our Lady of the Lake Regional Medical Center attempt to influence the subcommittee's work or conclusions." This conclusion is supported by the affidavits of Dr. Kouchoukos and Dr. Leaman, affidavits also attached. Also attached is the curriculum vitae of each doctor and to say the least, they are very impressive doctors in their fields of expertise.
Considering this record, in its entirety, we are convinced that the trial judge improvidently granted defendants' motion for summary judgment.

ONE OR TWO PRONG ANALYSIS
In their original brief, defendants argued that "the lone issue before the Court is whether appellees acted `without malice' and in the `reasonable belief' that the decision to terminate Dr. Smith's privileges was warranted." In their application for rehearing, defendants argue that this court erred in concluding that the statute imposes two, distinct, unrelated prerequisites for the qualified immunity to apply.
*1249 LSA-R.S. 13:3715.3 C sets forth criteria for application of the qualified immunity. The committee member must have acted "without malice and in the reasonable belief that such action or recommendation is warranted by the facts known to him."
According to the general rules of statutory construction, unless the context clearly indicates otherwise, the word "and" indicates the conjunctive and the word "or" indicates the disjunctive. LSA-C.C.P. art. 5056. See also LSA-R.S. 1:9; Watts v. Aetna Casualty and Surety Company, 574 So.2d 364, 370 (La.App. 1st Cir.1990); State v. Will, 536 So.2d 601, 603 (La.App. 1st Cir.1988). We are cognizant of the jurisprudence which suggests that, in a civil context, "and" may mean "or" and vise versa. However, when the context of the statutory provision does not clearly indicate otherwise, we are required to ascribe a conjunctive meaning to the word "and."
Therefore, it follows that from the plain wording of LSA-R.S. 13:3715.3, there are two prerequisites for the applicability of the qualified immunity. First, the committee member must have acted without malice. Second, the committee member must have acted with a reasonable belief that the action taken or recommendation made was warranted under the known facts.
Moreover, this court is not called upon to decide whether there should be one or two requisites to invoke the qualified immunity, but whether the language of the statute required proof of one or two distinct, yet related, conditions.[7] Had the legislature of this state envisioned that there is but one criteria for the application of the qualified immunity, the language of the statute would have clearly reflected this intent.
However, even assuming arguendo that the analysis required the application of only one criteria, namely that the committee members acted in good faith, which, in turn, implies that their determination was based on reasonable belief that the action was warranted by the known facts, the record does not support the defendants' contentions that they are entitled to judgment as matter of law with regard to the application of the immunity.

CONCLUSION
For the above reasons, defendants' application for rehearing is denied. Defendants are cast for all costs.
REHEARING DENIED.
LeBLANC, J., dissents and would grant a rehearing.
NOTES
[*] LeBlanc, J., dissents and would grant a rehearing.
[1] Judge Remy Chiasson, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] The parties are intimately familiar with the facts, and the background and posture of the instant case are adequately set forth in our original opinion, as well as in the opinions rendered by the federal court.
[3] In their subsequent application for rehearing, defendants apparently chose not to pursue this inconsistency.
[4] In their application for rehearing, defendants erroneously construe our original opinion as one which forges new territory, establishing a "bright-line" rule regarding the unavailability of summary judgment in the context of peer review. However defendants' failure to establish their entitlement to summary judgment in the instant case does not mean that summary judgment is always precluded in an appropriate case where the facts and circumstances warrant it.
[5] The following questions were posed to the joint committee:

1. Was the appropriateness of surgical risk evaluated prior to surgery?
2. Was the appropriateness of surgery indicated for each case?
3. Was the pre-operative and post-operative care of patients involved of satisfactory quality?
4. Are these death rates within the limits of acceptable standards for the service?
5. Is it the opinion of the services that the physician involved has met the standard of practice of cardiovascular surgery for this community?
[6] This list of cases is intended to be illustrative only and does not purport to be an exhaustive study of the jurisprudence.
[7] We note that defendants cite a plethora of cases from other jurisdictions which apply other state's versions of a qualified immunity statute.