639 So.2d 730 (1994)
Prentiss E. SMITH, M.D.
v.
OUR LADY OF THE LAKE HOSPITAL, INC., d/b/a Our Lady of the Lake Regional Medical Center, Kenneth C. Cranor, M.D., A. Foster Sanders, M.D., Donald R. Cowick, M.D., W. Howard Kisner, M.D., M.J. Rathbone, Jr., M.D., Louis P. Laville, Jr., M.D., B. Eugene Berry, M.D., W. Redfield Bryan, M.D., Mr. Sidney Duplessis, Mr. W.H. LeBlanc, Jr., Mr. Roland Toups, Mr. Robert Davidge, and Others Whose Identities and/or Roles Are Unknown to Plaintiff at This Time.
No. 93-C-2512.
Supreme Court of Louisiana.
July 5, 1994.
Rehearing Denied September 15, 1994.
Statement Concurring in Denial of Rehearing September 15, 1994.
*734 Thomas MacDougall Womack, Durrett, Hardin, Hunter, Dameron & Fritchie, Tom F. Phillips, Lloyd Joseph Lunceford, Taylor, Porter, Brooks & Phillips, Leon Gary, Jr., Gary, Field, Landry & Bradford, Baton Rouge, for applicant.
Kevin Patrick Monahan, Baton Rouge, for respondent.
Robert L. Roland, Randall Louis Champagne, Baton Rouge, for amicus curiae LA Hosp. Ass'n.
Thomas M. Hayes, Jr., Bruce McKamy Mintz, Monroe, for amicus curiae St. Francis Medical Center.
Donna Guinn Klein, Monica Ann Frois, New Orleans, for amicus curiae St. Francis Cabrini Hosp. of Alexandria, St. Patrick Hosp. of Lake Charles and Schumpert Medical Center of Alexandria.
Harmon F. Roy, Philip E. Roberts, Lafayette, for amicus curiae Our Lady of Lourdes Regional Medical Center.
Peter J. Butler, Donna Di Martino Fraiche, New Orleans, for amicus curiae American Hosp. Ass'n.
Charles Fenner Gay, Jr., Cristina Romig Wheat, Ralph H. Wall, New Orleans, for amicus curiae Alton Ochsner Medical Foundation.
HALL, Justice.[*]
This suit arises out of a hospital's termination of a cardiovascular surgeon's staff *735 privileges for incompetence and unprofessional misconduct. The surgeon, Dr. Prentiss E. Smith, sued the hospital, Our Lady of the Lake Hospital, Inc., d/b/a Our Lady of the Lake Regional Medical Center ("OLOL"); various members of the hospital's executive committee and board of trustees; his chief competitor, Dr. B. Eugene Berry; Dr. Berry's professional corporation, CVT Surgical Center, A Medical Corporation ("CVT"); and Dr. Berry's two partners, Drs. David Davis and Carlton Sheely. Dr. Smith's petition asserted numerous causes of action, including breach of contract, defamation and antitrust violations. The trial court dismissed this suit on summary judgment, finding all the defendants entitled to immunity from liability under LSA-R.S. 13:3715.3(C),[1] which grants peer review committee members qualified immunity. The court of appeal reversed, finding material factual issues as to whether the qualifications for invoking the immunity were met here, i.e., whether the committee members' action or recommendation was taken "without malice" and "in the reasonable belief that such action or recommendation [was] warranted by the facts known to [them]." On defendants' application, we granted certiorari to determine whether summary judgment was appropriate in this case. 93-C-2512 (La. 2/25/94); 632 So.2d 768.

I.
The long history giving rise to this litigation must be fully recounted to facilitate a detailed and complete resolution of the issues presently before this court. The depositions, affidavits and other supporting documents in the record reveal that the details of the lengthy peer review process underlying this litigation are essentially undisputed.
In 1969, Dr. Prentiss Smith was granted staff privileges as a cardiovascular surgeon at OLOL. Thereafter, Dr. Smith became the subject of two separate peer review inquires.[2] The first inquiry was initiated in 1982 when the recovery room nurses filed a series of incident reports regarding Dr. Smith's alleged medically improper, personally abusive and offensive conduct. Responding to these complaints, the OLOL Executive Committee established an Ad Hoc Investigating Committee. After reviewing the complaints, the Ad Hoc Committee recommended that Dr. Smith be given two months to resolve his conflicts with the recovery room nurses or his staff privileges would be terminated.
On September 27, 1982, the Executive Committee reviewed the Ad Hoc Committee's recommendation and resolved as follows: (i) that Dr. Smith's behavior was "at times, unprofessional and below the standards appropriate for the Medical-Dental Staff and, for that reason, that Dr. Smith be formally reprimanded and placed on one year of probation;" (ii) that "any incidents of a similar nature will be considered by the same Ad Hoc Committee during the probation ... and, if necessary, they may make additional recommendations to the Executive Committee which could include reduction, suspension, or revocation of clinical privileges;" and (iii) that the Executive Committee "include an abbreviated portion of this matter in the minutes of the Medical Staff Executive Committee which are circulated to the Staff." On October 6, 1982, the Executive Committee informed Dr. Smith in writing of the above resolutions.
On June 23, 1983, Mr. Robert Davidge, the OLOL Executive Director, sent a letter to Dr. Cranor, the Chief of Staff, regarding additional incident reports of a similar nature that the recovery room nurses had filed. In his letter, Mr. Davidge described Dr. Smith's behavior in the recovery room as "humiliating and intimidating to our personnel" and *736 stated that it "appeared to be vindicative reprisals for their earlier report on his aberrant behavior." At a June 27, 1983, Executive Committee meeting, Dr. Cranor read Mr. Davidge's letter. On July 1, 1983, the Executive Committee reconvened its prior Ad Hoc Committee to review the additional complaints. After meeting on July 18, 1983, and August 1, 1983, the Ad Hoc Committee recommended that Dr. Smith be given two months from the time of notification by the Executive Committee to resolve the existing "problems" between himself and the recovery room nurses and that if, at the end of that two-month period, "the situation has not sufficiently improved, his privileges will be suspended."
On August 22, 1983, the Executive Committee met and adopted the Ad Hoc Committee's recommendation. On August 25, 1983, Dr. Cranor wrote Dr. Smith, informing him that the Executive Committee had resolved that his relations with the recovery room staff would be "observed closely for a period of two months, at which time the then current situation will be evaluated and acted upon as seems appropriate."[3] On December 9, 1983, Dr. Cranor wrote Dr. Smith again and informed him that the Executive Committee, on the basis of its Ad Hoc Committee's report, resolved that he "continue on a probationary status, without limitation of privileges for one year on the condition that [he be] able to work within the guidelines of the Medical Staff."
During the pendency of these probation periods, a "blind" survey (i.e., using physician code numbers rather than physician names) of the mortality rates for patients undergoing three cardiovascular surgical procedures coronary artery bypass surgery, valve surgery and carotid endarterectomy surgery was conducted. As part of this survey, Dr. Berry was asked by the Executive Committee, particularly by Drs. Laville and Cranor, to prepare a report on the mortality rates for these selected procedures.[4] At a February 14, 1984 meeting of the Surgical/Dental Chief of Services, Dr. Berry presented his report. The report listed eight doctors by code number, breaking down the number of deaths per operation for each of the three surgical procedures for each doctor and totalling for each procedure all eight doctors' numbers with accompanying mortality percentages. Dr. Berry's report also specified with regard to doctor number 73601, which was disclosed to be Dr. Smith, a separate mortality percentage for each of the three surgical procedures and a separate mortality total for all the doctors excluding doctor number 73601.[5] Because Dr. Smith's mortality percentages were relatively higher than *737 the other doctors' combined percentages, the members of the Surgical/Dental Chief of Services Committee determined that further investigation was required into the matter. These mortality statistics thus were the impetus for the second peer review inquiry against Dr. Smith.
On February 17, 1984, Dr. Sanders, Chief of Staff, approached Dr. Smith at OLOL and declared that his privileges would be summarily suspended if he did not agree to cease acting as primary surgeon in performing any of the three surgical procedures referenced in the mortality report; Dr. Sanders gave as the reason that Dr. Smith's mortality rates were "unacceptably high." Dr. Smith agreed, and Dr. Sanders confirmed that agreement in writing.
On February 20, 1984, the Executive Committee met to consider the curtailment of Dr. Smith's surgical privileges. The minutes of that meeting reflect that Dr. Smith attributed the statistical results to the fact that he had more "poor risk" and "salvage" cases. The minutes further reflect that a complete in-house evaluation of the surgical results of the entire OLOL open heart program since its inception in 1980 would be undertaken. The minutes still further reflect that Dr. Smith's voluntary suspension be continued for two weeks pending further investigation. Dr. Sanders communicated that resolution to Dr. Smith in writing.
On March 5, 1984, the Executive Committee met again. After reviewing more extensive statistics,[6] the Executive Committee resolved that: (i) Dr. Smith be requested to continue his "voluntary abstention from the above three procedures as the primary surgeon or assistant, until a thorough study can be done by the Society of Thoracic Surgeons;" and (ii) if he did not agree to the "voluntary suspension, then his privileges should be suspended." On March 7, 1984, Dr. Sanders communicated that resolution to Dr. Smith in writing, informing him that "[w]e are in the process of engaging outside, disinterested professionals to evaluate the service and your work ... [and his] understanding that the above agreement will remain in effect until further notice."
On March 14, 1984, Dr. Sanders mailed a letter to Dr. George Lindesmith, Chairman of the Committee on Standards and Ethics for the Society of Thoracic Surgeons (the "Society"), requesting that the Society review the matter.[7] The letter stated that Dr. Smith's mortality rates for the three surgical procedures "were in excess of the national average and unacceptable for the service." The letter also stated that "[t]he surgeon involved bases his high mortality rates primarily on the large number of salvage cases that he does. [H]e states that he and his associate [Dr. Edward McCool] have an agreement that he is to do the more difficult and salvage cases." Enclosed with the letter was the more extensive, four year mortality statistics, covering 1980 through 1983.
On March 19, 1984, Dr. Sanders wrote to Drs. Berry and Helm, the Chiefs of the Thoracic and Cardiovascular Surgery Service and Cardiovascular Diagnostic Service, respectively (hereinafter referred to as the "Joint Services"), informing them that Dr. Smith had requested that the two services jointly meet and review his mortality statistics and his death cases, and requesting that the two services address five specific questions.[8]
*738 On March 26, 1984, the Executive Committee met and resolved that Dr. Sanders also convey to the Joint Services "that some concern was felt by the Executive Committee regarding communication between Dr. Smith and the Recovery Room Staff, and did this present a problem with his post-operative care." The minutes from this meeting reflect that two additional incident reports had been filed in the past month and that it was resolved to hold these in abeyance pending a report from the Joint Services.
On April 3, 1984, the Joint Services met and reviewed the mortality statistics and the charts of twelve of Dr. Smith's patients who had died following the three selected surgical procedures during the eighteen-month period from January 1982 to June 1983. The cardiologist for each case presented that case to the group, along with appropriate cineangiograms (the cardia catherization films). After reviewing the mortality cases, the group of participating doctors unanimously found that the appropriateness of surgical risk was evaluated before surgery, that surgery was appropriate in every case, and that half the cases were "high risk." Without dissent, the group also concluded that all pre-operative and post-operative care was satisfactory. The group, however, abstained from answering the last two questions "because of the need for a statistician to study the surgical statistics and the need for more complete statistical information."
On May 1, 1984, Dr. Sanders wrote to Dr. Berry requesting that the Thoracic and Cardiovascular Surgery Service "proceed with a complete investigation." Specifically, Dr. Sanders requested that either Dr. Berry alone or in conjunction with his entire service answer the last two questions that the Joint Services abstained from answering. After conducting a telephone poll of his service, Dr. Berry wrote Dr. Sanders on May 24, 1984, informing him that his service had, by a split vote, answered that Dr. Smith's death rates were above the limits of acceptable standards for the service and that Dr. Smith had not met the standard of practice for cardiovascular surgery for this community. Dr. Berry, however, expressed the service's concern that the data obtained from the eighteen-month review may not be truly representative of Dr. Smith's total experience. Particularly, Dr. Berry concluded the letter by stating that the service concurs "a more complete evaluation is indicated" and that, in his opinion, "the best procedure would be to continue with the plans to have this work evaluated by a committee from the Society of Thoracic Surgeons."
On June 12, 1984, Dr. Sanders wrote Dr. Smith, requesting him to continue his "voluntary curtailment" of the three surgical procedures until the Society rendered their findings.
On July 24, 1984, the Thoracic and Cardiovascular Surgery Service met and reviewed two of Dr. Smith's cases. The minutes of this meeting, prepared by Dr. Berry, indicate that the group's consensus was that the pre-operative evaluations of the patients were inadequate. The July 24, 1984 report was reviewed on September 4, 1984, by the Tissue Committee,[9] which agreed with the report as to one of the cases and referred the matter to the Executive Committee.
On March 5, 1985, the Society rendered its unfavorable report on Dr. Smith. The report was rendered by the Society Subcommittee appointed to review the matter. The Subcommittee was composed of two cardiovascular surgeons and one cardiologist. As evidenced by their curricula vitae, these committee members were from different geographic areas and had impeccable credentials. As evidenced by the Society's invoice, the report was the outcome of an extensive study by the committee members, taking over 100 hours of the committee members' time and costing the hospital $12,292.77 for the Society's services. During the course of *739 the review, the committee members requested from, and were furnished by, OLOL with the following records for each of the over 100 of Dr. Smith's patients whose cases they reviewed: the history and physical examination, narrative summary, catheterization report, operative report and perfusion report. These cases all involved patients who had undergone the three selected surgical procedures during 1980 through 1983. The Subcommittee did not review any films (i.e., cineangiograms), talk to any of the cardiologists involved in the cases or conduct an on-site visit.[10]
The Subcommittee's report expressly stated that Dr. Smith "presented his side of the story" both in writing, by letter, and orally, in a telephone conversation with one of the committee members and in a two-hour meeting with the entire Subcommittee. The report further stated that Dr. Smith had agreed to the Society's review.[11] The report still further delineated the Subcommittee's seven separate conclusions,[12] closing with the following summary statement: "it is the feeling of the committee that the surgery performed by Dr. Smith would appear not to be up to the acceptable standards of practice for the time interval involved."
Armed with the Society's report, the Executive Committee met on March 11, 1985, and recommended "to remove Dr. Smith from the Medical/Dental staff of Our Lady of the Lake ... terminating all privileges." On the next day, Dr. Cowick, Chief of Staff, wrote to Dr. Smith, informing him that (i) the Executive Committee had recommended his privileges be suspended effective immediately, (ii) the Society's review "ha[d] completely supported that the level of care of these patients is below the standards of someone with [his] training and experience," and (iii) he had the right to a hearing and appellate review under the OLOL Bylaws. Dr. Smith exercised his right to appeal.
On April 22, 1985, Dr. Cowick wrote Dr. Smith, advising him that: "[the] Hearing Committee will consider the facts as presented by the Medical Staff Executive Committee, especially regarding: 1) The report from the Society of Thoracic Surgeons. 2) The *740 findings of the Cardiovascular Surgery Service of [OLOL]. 3) Multiple hospital incidents requiring a period of probation." The letter further advised him that the above "listed items were the basis of suspension by the Medical Executive Committee." The letter still further advised him of the composition of the Ad Hoc Hearing Committee and gave him an opportunity to file objections thereto. Dr. Smith objected to six of the seven members as being "overtly hostile to [him] for purely arbitrary reasons." Deferring to Dr. Smith's objections, the Executive Committee partially reconstituted the composure of the Ad Hoc Hearing Committee.
On March 27, 1986, the Ad Hoc Hearing Committee met with retired Judge Lewis Doherty presiding in a purely moderator role (i.e., not to render any decision). Dr. Smith was permitted to appear before them, to present evidence, and to press for the adoption of his views, but was not permitted to have his attorney present. As part of the evidence, the committee reviewed a report prepared by Dr. Robert C. Elston, who Dr. Smith retained to critique the mortality statistics. Dr. Elston's report indicated that the statistical significance of the mortality statistics was that "[a]lthough the data show that [Dr. Smith's] mortality rate for coronary artery bypass and valve replacement are significantly greater than those for other physicians, it cannot be inferred from this that [Dr. Smith's] skill as a physician is inferior to that of the other physicians." Also as part of the evidence, the committee reviewed a letter from Dr. Charles Pearce, the head of cardiothoracic surgery at LSU School of Medicine, who was requested by Dr. Smith to review the Society's report. Dr. Pearce, in his letter, strongly criticized the Society's conclusions and characterized their report as "unduly harsh." Dr. Pearce further stated his opinion that the most likely reason for the Society's unfavorable report was Dr. Smith's abrasive personality; specifically, he wrote that "[i]n all likelihood, Dr. Smith's abrasive personality influenced the committee adversely, during his telephone conversation with Dr. Waldhausen on December 27, 1984, and secondly, during a two hour meeting with the committee on January 19, 1985."
On April 4, 1986, the Ad Hoc Hearing Committee rendered its majority opinion to the Executive Committee, concluding that:
(1) Adequate evidence was not present to support suspension of privileges ... but that evidence justified "stringent monitoring" of Dr. Smith's hospital practice under the condition that he agree to strict conditions;[13] and
(2) The Committee unanimously recognizes and condemns as shameful Dr. Smith's contemptuous disregard for the rights, sensibilities and dignity of selected patients, Hospital personnel and colleagues.
On April 9, 1986, the Executive Committee voted unanimously "to uphold the termination of [Dr. Smith's] staff suspension from [OLOL]," concluding that the Ad Hoc Hearing Committee did not give good cause to reverse its initial decision. On April 11, 1986, Dr. W. Howard Kisner, Chief of Staff, wrote Dr. Smith, informing him of the Executive Committee's decision and notifying him of his right to appeal that decision under the OLOL Bylaws.
The Executive Committee's decision could become effective only if affirmed by the OLOL Board of Trustees. Before doing so, the Board of Trustees appointed a committee of its own, the Appellate Review Committee, to review the Executive Committee's recommendation. The Appellate Review Committee met for several hours on several days and reviewed numerous documents. Dr. Smith availed himself of the opportunity to meet with them and to present his case. At the conclusion of their deliberations, the Appellate Review Committee recommended that the Executive Committee's decision to terminate Dr. Smith's staff privileges be adopted.
*741 On June 13, 1986, a quorum of the Board of Trustees met and voted by secret ballot to terminate Dr. Smith's privileges on grounds of both "medical practice" and "personal conduct." The Board, however, reserved its final decision pending review of the "question of Dr. Smith's misunderstanding of the actions pending against him." The misunderstanding involved a semantic question regarding whether Dr. Smith was notified that he was defending against an action to "suspend," as opposed to an action to "terminate," his privileges. The Board referred this matter to a Joint Conference Committee for review and gave Dr. Smith an opportunity to address that committee. On June 27, 1986, the Board of Trustees voted to finalize the termination of Dr. Smith's staff privileges. On that same date, Mr. Davidge wrote Dr. Smith, informing him of the Board's decision.
On June 26, 1987, Dr. Smith simultaneously filed a federal RICO suit and the instant state court suit. On September 14, 1988, after "energetically" pursuing discovery in the federal suit, conducting over twenty depositions and requesting production of thousands of pages of documents, and before the district court judge ruled on defendants' pending motion to dismiss, Dr. Smith voluntarily dismissed the federal RICO suit. On that same date, Dr. Smith activated this, until then dormant, parallel state court action, serving both the original petition and a First Amended Petition on defendants. The original petition tracked virtually verbatim the federal complaint, excepting of course the RICO claim, and alleged the following four causes of action: (i) breach of contract, (ii) negligence and other tortious conduct, (iii) unfair trade practices, and (iv) defamation of character. And, the First Amended petition differed only in that it named three additional defendantsDr. Berry's professional corporation, CVT, and Dr. Berry's two partners, Drs. David Davis and Carlton Sheelyand asserted an antitrust claim. Dr. Smith prayed for not only damages, but also injunctive relief, including reinstatement of his staff privileges.
Back in federal court, on January 19, 1989, the defendants filed a motion for sanctions under Fed.Rule of Civ.Pro. 11, which the federal district court judge granted. Smith v. Our Lady of the Lake Hospital, Inc., 135 F.R.D. 139 (M.D.La.1991). That holding, however, was reversed on appeal. 960 F.2d 439 (5th Cir.1992).
Back in state court, the defendants, after answering and filing various exceptions, filed a joint motion for summary judgment, asserting entitlement to immunity from liability under LSA-R.S. 13:3715.3(C). Rendering detailed written reasons for judgment, the trial court concluded that the statutory provision applied and granted a global summary judgment in favor of all defendants, dismissing Dr. Smith's suit in its entirety. In finding that the various committee members did not act with malice or in the unreasonable belief that such recommendation to terminate Dr. Smith was warranted by the facts known to them, the trial court emphasized that "[t]his peer review process took place over a four year period of time and numerous physicians were involved in the decision ultimately made."
Reversing, the court of appeal found that the trial court erred in granting summary judgment for two reasons. First, it held that "a determination of whether defendants are entitled to qualified immunity requires the trial court to determine the subjective motive and knowledge of the committee members" and that this determination would be "in contravention of the jurisprudential prohibition against such inquiry on a motion for summary judgment." Smith v. Our Lady of the Lake Hospital, Inc., 612 So.2d 816, 821 (La.App. 1st Cir.1992). Second, it held that the trial court erred by weighing the credibility of the various witnesses whose affidavits or depositions were submitted in support and in opposition to the motion for summary judgment. 612 So.2d at 821-22. While the court of appeal, by a split vote, denied defendants' application for rehearing, it opted to render detailed reasons for doing so. 624 So.2d 1239 (La.App. 1st Cir.1993). To the extent relevant to our decision, those reasons are discussed below.
For the reasons that follow, we affirm the court of appeal's decision as to the hospital, OLOL, and Dr. Berry's professional corporation, *742 CVT, and as to the claims asserted for injunctive relief; and reverse as to the remaining, individual defendants and the damage claims asserted against them.

II.
Ordinarily, this court refrains from granting certiorari in cases, like this one, in which summary judgment has been denied below, as sparing a mover the expense and inconvenience of a trial on the merits is not, in and of itself, a ground for entertaining a writ. Louisiana Supreme Court, Rules of Court, Rule X. We, nonetheless, granted certiorari in this case because of the significance to the medical profession of the res nova issue presented, as evidenced by the numerous amici curie briefs filed in this matter. Briefly stated, the issue presented involves construing LSA-R.S. 13:3715.3(C), and enunciating an analytical framework to facilitate the pre-trial disposition of the applicability of the statutory immunity from liability it provides peer review committee members. This is a res nova issue because, while the statutory provision was enacted a decade ago, the court of appeal's decisions in the instant case are the first published decisions to construe it.
The obvious legislative purpose behind this statutory provision is to encourage the medical profession to police its own activities with minimal judicial involvement. See Campbell v. St. Mary's Hospital, 312 Minn. 379, 252 N.W.2d 581 (1977); Cooper v. Delaware Valley Medical Center, 428 Pa.Super 1, 630 A.2d 1 (1993), appeal granted, 639 A.2d 28 (Pa.1994). The wisdom of this legislative purpose is evident: "[o]ur ignorance of such multisyllabic terms found in the present record... is no less than that shared by the general public. Simply stated, courts are ill-equipped to pass judgment on the specialized expertise required of a physician, particularly when such a decision is likely to have a direct impact on human life." Campbell, 252 N.W.2d at 587. "`It is the [Hospital] Board, not the court, which is charged with the responsibility for providing a competent staff of doctors.... The evaluation of professional proficiency of doctors is best left to the specialized expertise of their peers, subject only to limited judicial surveillance.'" Woodbury v. McKinnon, 447 F.2d 839, 842-43 (5th Cir.1971) (quoting Sosa v. Board of Managers of the Val Verde Memorial Hospital, 437 F.2d 173, 177 (5th Cir.1971)); Leach v. Jefferson Parish Hospital District No. 2, 870 F.2d 300, 302 (5th Cir.), cert. denied, 493 U.S. 822, 110 S.Ct. 80, 107 L.Ed.2d 46 (1989) (quoting Sosa, supra).
Recognizing that, because of the specialized expertise and level of skill required in the practice of medicine, the medical profession is best-equipped to police its own ranks, legislatures in virtually every state have enacted statutes similar to LSA-R.S. 13:3715.3(C). The majority of states have qualified the immunity, imposing as statutory hurdles the threshold requirement that the peer review actions be taken without malice, in good faith or reasonably in order to invoke the immunity; some states, however, have provided for absolute immunity. D. Jorstad, The Legal Liability of Medical Peer Review Participants for Revocation of Hospital Staff Privileges, 28 Drake L.Rev. 692, 694 (1978-79) (hereinafter "Jorstad"); J. Oliverio, Comment, Hospital Liability for Defamation of Character During the Peer Review Process: Sticks and Stones May Break My Bones, But Words May Cost Me My Job, 92 W.Va.L.Rev. 739, 752 (1990) ("Sticks and Stones Comment"). While these statutory enactments vary in terms of the protection they afford, they share the common purpose of promoting effective peer review. One commentator aptly articulated that purpose as follows:
The function [peer review committees] serve in protecting patients and the general public from less than competent physicians is of exceeding importance as there is no doubt that an incompetent physician can make mistakes costing human lives. On the other hand, hospitals and their peer review committees are expected to honor the rights of the private physician. The suspension of a physician's hospital staff privileges can have a devastating effect on his practice ... [T]he suspension of a physician's staff privileges at one hospital may jeopardize his status at another hospital, *743 making it difficult, if not impossible, to obtain staff privileges at a new hospital.
* * * * * *
The individual members of peer review committees are increasingly becoming the targets of legal activity directed against them by disgruntled doctors whose staff privileges have been suspended upon the recommendation of the committee. Although physician rights clearly need to be protected, the effectiveness of medical peer review committees could be seriously hampered if committee participants were subjected to a barrage of suits resulting from their committee evaluations.
Jorstad, supra at 693.
Congress likewise has recognized "an overriding national need to provide incentive and protection for physicians engaging in effective professional peer review," enacting a federal immunity provision as part of the 1986 Health Care Quality Improvement Act ("HCQIA"). 42 U.S.C. § 11101(5). As the United States Supreme Court has described it, HCQIA "essentially immunizes peer-review action from liability if the action was taken `in the reasonable belief that [it] was in the furtherance of quality health care.'" Patrick v. Burget, 486 U.S. 94, 106 n. 8, 108 S.Ct. 1658, 1665 n. 8, 100 L.Ed.2d 83, 95 n. 8 (1988).
HCQIA, like the majority of state enactments, provides a qualified immunity for peer review actions meeting certain statutory standards, i.e., "reasonable belief that the action furthered quality health care, fact gathering, notice and hearing, and a resulting reasonable belief that the action taken was warranted." Fobbs v. Holy Cross Health System Corp, 789 F.Supp. 1054, 1065 (E.D.Cal.1992); 42 U.S.C. § 11112(a). As discussed below, the standard under the federal counterpart provision is predominately one of objective "reasonable belief." Fobbs, 789 F.Supp. at 1064.
HCQIA includes a provision permitting individual states to opt-in early. 42 U.S.C. § 11111(c). While the Louisiana legislature elected early opt-in, HCQIA did not become effective in this state until July 15, 1988. La.Acts No. 690 of 1988. As the peer review actions in this case pre-dated the effective date of HCQIA, the federal counterpart provision has no direct applicability in this case. This case is thus governed solely by the state immunity provision, LSA-R.S. 13:3715.3(C).
State legislative enactments providing qualified immunity, like LSA-R.S. 13:3715.3(C), remarkably resemble a special-interest, conditional privilege recognized in defamation actions. One similarity between them is that they both apply to medical peer review committee members' communications. The conditional privilege, which has often been invoked in the analogous context of suits arising out of the employer-employee relationship, applies when the parties share a common interest. W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton on Torts § 115, pp. 828-29 (5th Ed.1984). The essential elements of the conditional privilege are "`good faith, an interest to be upheld and a statement limited in scope to this purpose, a proper occasion, and publication in the proper manner and to proper parties only.'" Carter v. Catfish Cabin, 316 So.2d 517, 522 (La.App. 2d Cir.1975) (quoting Madison v. Bolton, 234 La. 997, 102 So.2d 433 (1958)). Stated otherwise, the conditional privilege is an affirmative defense provided by law for one who establishes that he made a statement "(1) in good faith (2) on a matter in which he had an interest or a duty (3) to another person with a `corresponding interest or duty.'" Rouly v. Enserch Corp., 835 F.2d 1127, 1130 (5th Cir.1988).
Remarks made by committee members during the peer review process clearly satisfy these requirements. "[T]hey involve statements made by hospital officials about matters of concern to the hospital and the statements are made pursuant to a duty to inform persons with an interest in the matter." Sticks and Stones Comment, supra at 751. The conditional privilege thus has often been invoked by courts in defamation suits arising out of the peer review process. Jorstad, supra at 698; see also S. Speiser, C. Krause & A. Gans, 8 The American Law of Torts § 29:104, pp. 683-86 (1991) (collecting cases applying privilege in this context).
*744 Soentgen v. Quain & Ramstad Clinic, P.C., 467 N.W.2d 73 (N.D.1991), is illustrative. There, the court started with the premise that an employer's communications regarding the conduct of an employee when necessary to protect the employer's interests are conditionally privileged. Continuing, the court explained "[t]hat is especially true where the employer is a hospital because a hospital has a duty to provide the public with competent physicians. A hospital's proper investigation of complaints about its physicians is necessary to ensure that its physicians are competent, and the hospital's failure to investigate complaints could expose it to liability." Id. at 79 (citations omitted). The court concluded that "a hospital's investigation of its physicians' competency is a subject matter about which both the maker and receiver have a common interest, and a discussion of complaints with the physician is relevant to that common interest." Id. at 79; see also Maewal v. Adventist Health Systems/Sunbelt, Inc., 868 S.W.2d 886, 893 (Tex. App.Fort Worth 1993) ("[t]he peer review process is analogous to an employer's performance assessment of an employee or an employer's investigation into an employee's alleged wrongdoing").
Another similarity between the conditional privilege and the statutory qualified immunity provisions is that they have identical policy underpinnings. The policy underpinnings of the conditional privilege are "`the social necessity of permitting full and unrestricted communication concerning a matter in which the parties have an interest or duty, without inhibiting free communication in such instances by the fear that the communicating party will be held liable in damages if the good faith communication later turns out to be inaccurate.'" Carter, 316 So.2d at 522 (quoting Toomer v. Breaux, 146 So.2d 723 (La.App. 3d Cir.1962)). Medical peer review committee actions, in general, implicate identical policy concerns. As one court explained, "[i]f a conditional privilege should ever operate, indeed if there is one instance where society should encourage uninhibited communication, it is in the review of the competency of medical professionals." Sibley v. Lutheran Hospital of Maryland, Inc., 871 F.2d 479, 484 (4th Cir.1989) (emphasis in original). Another court likewise explained that "[t]he existence of a qualified privilege in investigations of physicians embodies the important public policy of protecting the welfare of patients by assuring the free exchange of information." Soentgen, 467 N.W.2d at 79. Similarly, the qualified immunity provisions, in particular, implicate the same policy concerns; as one commentator explained, "`[a] frank and open discussion which is fundamental to peer review cannot occur when the participants are concerned about the possibility of ... lawsuits claiming malicious defamation.'" Sticks and Stones Comment, supra at 753.
Both the courts and commentators, however, have cautioned the need to condition the privilege and the statutory immunity provisions so as to protect the reviewed physician from "malicious defamation." As one commentator noted, "`[d]efamatory statements, motivated by ill-will or malice, have no place in a forum convened to determine the qualifications of an individual to continue in the practice of his profession.'" Sticks and Stones Comment, supra at 751. Likewise, one court noted that "[w]hile the Legislature recognized the need for free and frank discussion, it also recognized that such discussion must represent fair comment and be suited to the fulfillment of the purposes of the [qualified immunity enactment]." Cooper v. Delaware Valley Medical Center, 428 Pa.Super. 1, 630 A.2d 1, 8 (1993), appeal granted, 639 A.2d 28 (Pa.1994).
Yet another similarity between the conditional privilege and the qualified immunity provisions is that the abuses that render the privilege inapplicable are the same as the statutory qualifications placed on the immunity provisions. The conditional privilege is abused, and thus inapposite, when the "defendant steps outside of the scope of the privilege, or abuses the occasion." Prosser & Keeton on Torts, supra at § 115, p. 832. There are "some half a dozen or so well known ways" in which the conditional privilege may be abused. 8 The American Law of Torts, supra at § 29:116, p. 775. The most commonly cited ones, however, especially in Louisiana jurisprudence, are when the defendant's remarks are made with malice or without *745 good faith, or for a purpose outside the scope of the privilege. See Elmer v. Coplin, 485 So.2d 171, 177 (La.App. 2d Cir.), writ denied, 489 So.2d 246 (La.1986). The state qualified immunity provisions, as noted above, contain similar statutory hurdles, requiring as a prerequisite for invoking the immunity that the peer review committee member's actions be taken without malice, in good faith or reasonably. Jorstad, supra at 694. Both the conditional privilege and the qualified immunity enactments are thus limited to "remarks made by those participating in the peer review process, solely for the purpose of the peer review and without any indication of malice." Sticks and Stones Comment, supra at 752.
Given these similarities, it is not surprising that these legislative enactments have been described as codifying the conditional privilege. R. Hall, Hospital Committee Proceedings and Reports: Their Legal Status, 1 Am.J. of L. & Med. 245, 262 (1975); see also G. Gosfield, Comment, Medical Peer Review Protection in the Health Care Industry, 52 Temp.L.Q. 552, 571-75 (1979). These legislative enactments have also been described as broadening the conditional privilege, extending it beyond the defamation context and incorporating it into a general statutory immunity from all civil liability. Jorstad, supra at 698 n. 37. It is thus logical to look to the case law construing the conditional privilege for guidance in construing these qualified immunity provisions. See Maewal, 868 S.W.2d at 893.

III.
The jurisprudence on the conditional privilege is especially helpful in construing the qualified immunity provisions in three respects; namely, it provides (i) an analytical framework for determining the applicability of the immunity at an early stage in the litigation, (ii) a burden of proof allocation rule, and (iii) a definitional basis for the statutory qualifications on the immunity.

(i) Analytical Framework:
The analysis for determining whether a conditional privilege exists involves a two-step process. First, it must be determined whether "the attending circumstances of a communication occasion a qualified privilege," which means that a determination must be made of whether the requirements for invoking the privilege are satisfied. Soentgen, 467 N.W.2d at 78-79. The second step of the analysis requires a determination of whether the privilege was abused, which requires that the grounds for abusemalice or lack of good faithbe defined. Id. While the first step is generally determined by the court as a matter of law, the second step of determining abuse of a conditional privilege or malice is generally a fact question for the jury "[u]nless only one conclusion can be drawn from the evidence." Prosser & Keeton on Torts, supra at § 115, p. 835; Restatement (Second) of Torts § 619.
We adopt this two-step analytical framework here, finding it appropriate for facilitating the pre-trial disposition of the applicability of the statutory immunity from liability provided by LSA-R.S. 13:3715.3(C).
Translated, the first step requires that we determine whether the requirements for invoking the immunity have been satisfied. Finding implicitly that the statutory requirements were satisfied as to all claims and as to all defendants, the trial court granted a global summary judgment and dismissed Dr. Smith's suit in its entirety. Our analysis of the statute, however, reveals that, by its plain terms, it extends its protection only to certain claims and to certain defendants. As to claims, the statute extends only to damage claims, and thus cannot, as a matter of law, preclude Dr. Smith's injunctive relief claims. As to defendants, the statute extends only to individuals, i.e., peer review committee members, not to entities, and thus, as a matter of law, cannot preclude Dr. Smith's claims against either the hospital, OLOL, or Dr. Berry's professional corporation, CVT. Hence, summary judgment on the injunctive claims and in favor of OLOL and CVT is thus precluded.[14]
*746 While we recognize a strong argument could be voiced in favor of extending the statute to cover the hospital, we decline to judicially rewrite the statute on policy grounds. See Cooper, 630 A.2d at 9; see also Rees v. Intermountain Health Care, Inc., 808 P.2d 1069, 1082 (Utah 1991) (dissenter noting that "it makes little sense to immunize physicians from liability without granting similar immunity to hospitals"); cf. 42 U.S.C. §§ 11111, 11151 (HCQIA expressly extends its protections to a "professional review body," which is defined as a "health care entity," which in turn is defined as including a licensed hospital).
We now must address the more difficult question of whether the statutory protection extends to the remaining individual defendants (hereinafter referred to collectively as "Defendants"). There is little doubt, and Dr. Smith does not contend to the contrary, that Defendants' actions on which liability is alleged all arise within the context of the peer review process. Defendants were all members of one or more review committees and thus fit the statutory profile of "[committee] member[s]" acting "within the scope of the functions of such committee." LSA-R.S. 13:3715.3(C).[15] The sole dispute is whether Defendants' actions were taken without malice and in good faith, which is the second step of the inquiry.
As noted above, this second step is generally a jury question because it involves factual issues. Yet, if the evidence supports only one conclusion, summary judgment is appropriate. Prosser & Keeton on Torts, supra at § 115, p. 835; Soentgen, 467 N.W.2d at 79 (noting that "where the facts and inferences are such that reasonable minds could not differ, factual issues are questions of law" and upholding summary judgment in hospital's favor on terminated physician's defamation claims). Significantly, the conditional privilege jurisprudence, as well as the jurisprudence construing state qualified immunity provisions similar to LSA-R.S. 13:3715.3(C) and the federal HCQIA counterpart provision have all found summary judgment disposition of this issue appropriate.[16] In so doing, the courts have focused on two factors: one, that the plaintiff has the burden of proving malice or lack of good faith; and two, that the definition of malice or lack of good faith in this context is predominately one of objective reasonableness. Each of these factors is discussed in turn below.

(ii) Burden of Proof Allocation Rule:
The conditional privilege rebuts the plaintiff's allegations of malice and places the burden of proof on the plaintiff to establish malice or lack of good faith. Rouly v. Enserch Corp., 835 F.2d 1127, 1130 (5th Cir. 1988); Prosser & Keeton on Torts, supra at § 115, pp. 834-35. Put another way, "[i]n effect assertion of a qualified [or conditional] privilege constitutes a rebuttal of the allegation of malice." Boyd v. Community Center Credit Corp., 359 So.2d 1048, 1050 (La.App. 4th Cir.1978). Similarly, several peer review immunity statutes, including the federal *747 HCQIA counterpart provision, expressly codify such a presumption of good faith. See 42 U.S.C. § 11112(a). While there is no express presumption in LSA-R.S. 13:3715.3(C), in light of the public policy behind that enactment of encouraging good faith peer review and discouraging retaliatory suits by disciplined doctors, we construe it as creating such a presumption. Hence, the burden is on the plaintiff-physician to establish a lack of good faith or malice.
Construing state qualified immunity provisions similar to LSA-R.S. 13:3715.3(C), courts have stressed the plaintiff's burden to come forward with specific evidence of malice and bad faith, as opposed to broad, unsubstantiated allegations, reasoning that "[i]f lawsuits by unhappy reviewees can easily follow any decision ... peer review ... will become an empty formality, if undertaken at all. Banning such lawsuits except where there is real evidence of actual malice is an integral portion of our legislature's intent." Scappatura v. Baptist Hospital of Phoenix, 120 Ariz. 204, 584 P.2d 1195, 1201 (App. 1978). As one commentator aptly observed, "[t]his seems only logical in light of the fact that the legislative purpose in enacting these immunity statutes was to protect reviewing participants from litigation. This purpose would be defeated if a plaintiff need only speculate whether reviewing physicians acted with malice in their evaluations to state a valid claim." Jorstad, supra at 696.
Consequently, "[m]ere allegations of malice and bad faith, even with specifications of personal animosity and possible prior overreaching of authority, will not suffice to allow an action against hospital personnel engaging in peer review." Scappatura, 584 P.2d at 1201; Veldhuis v. Allan, 164 Mich.App. 131, 416 N.W.2d 347, 350 (1987) (holding plaintiff's offering of "only speculation concerning defendants' alleged nefarious motives" insufficient to preclude summary judgment); Limjoco v. Schenck, 169 Wis.2d 703, 486 N.W.2d 567, 571 (App.), review denied, 491 N.W.2d 768 (Wis.1992) (finding insufficient evidence to raise genuine issue of fact regarding alleged improper motives of "grudge or vendetta" or economic gain); Campbell v. St. Mary's Hospital, 312 Minn. 379, 252 N.W.2d 581, 587 (1977) (finding summary judgment appropriate as plaintiff's broad allegations of malice amounted to "unsubstantiated speculation as to the reasons for the revocation of his surgical privileges"); Harris v. Bellin Memorial Hospital, 13 F.3d 1082, 1090 (7th Cir.1994) (finding plaintiff's allegations of defendants' "motive to skew the peer review against him" unsupported by any credible evidence); Onat v. Penobscot Bay Medical Center, 574 A.2d 872, 875 (Me. 1990) (finding summary judgment appropriate as plaintiff failed to identify any factual basis for allegations of malice).
Likewise, the scant jurisprudence construing the federal HCQIA counterpart provision has found that summary judgment disposition of this issue is appropriate. Austin v. McNamara, 979 F.2d 728 (9th Cir.1992); Smith v. Ricks, 798 F.Supp. 605 (N.D.Cal. 1992); Fobbs v. Holy Cross Health System Corp, 789 F.Supp. 1054 (E.D.Cal.1992). In so doing, the courts have relied both on the fact (noted above and discussed in detail below) that the standard Congress selected is primarily one of objective reasonableness and on the expression of legislative intent that this determination be made as expeditiously as possible so as to avoid protracted litigation. Austin, 979 F.2d at 734. More specifically, quoting the legislative history, the Austin court noted that the intent was to "`allow defendants to file motions to resolve the issue of immunity in as expeditious a manner as possible.'" 979 F.2d at 734 n. 5 Echoing the importance of pre-trial disposition of the HCQIA immunity issue, the commentators have suggested that "[t]he most effective point at which to decide [whether there is qualified immunity] is prior to full trial." J. Neff, Note, Physician Staff Privilege Cases: Antitrust Liability and the Health Care Quality Improvement Act, 29 Wm. & Mary L.Rev. 609, 628 (1988) (quoted in Austin v. McNamara, 731 F.Supp. 934, 938 (C.D.Cal.1990)).[17]
*748 In sum, summary judgment is appropriate on the qualified immunity issue when the defendants establish that "the physicians responsible for reviewing plaintiff's case in the intrahospital proceedings fairmindedly sought to assess plaintiff's competency," and the plaintiff fails to come forward with any specific rebuttal evidence establishing malice or lack of good faith. Regualos v. Community Hospital, 140 Mich.App. 455, 364 N.W.2d 723, 727 (1985).

(iii) Definitional Basis for Statutory Qualifications on Immunity:
As noted, the same factors that render the conditional privilege inapposite render the qualified immunity under LSA-R.S. 13:3715.3(C) inapposite. Recapping, the conditional privilege is abused, and thus inapposite, when statements are made with malice, without a reasonable basis for believing them to be true or on a subject matter outside the common interest or duty. Soentgen v. Quain & Ramstad Clinic, P.C., 467 N.W.2d 73, 79 (N.D.1991). Tracking almost verbatim these grounds for finding an abuse of the conditional privilege, LSA-R.S. 13:3715.3(C) qualifies the immunity from liability by providing that it applies only when the committee member's action or recommendation is taken "without malice," "in the reasonable belief that such action or recommendation is warranted by the facts known to him," and "within the scope of the functions of such committee." LSA-R.S. 13:3715.3(C).
Before looking to the jurisprudence construing the conditional privilege for guidance in defining these statutory qualifications on the immunity, we find it necessary to resolve an issue of statutory construction that overlaps with this definitional issue. The overlapping issue is whether the two statutory qualifications"without malice" and "in the reasonable belief that such action or recommendation is warranted by the facts known to [the committee member]"impose an integrated, one-prong standard, as Defendants contend, or a two-prong standard, as Dr. Smith contends. Classifying the qualifications as imposing a two-prong standard, the court of appeal relied on the plain language of LSA-R.S. 13:3715.3(C), which uses the conjunctive word "and," and reasoned that "[h]ad the legislature of this state envisioned that there is but one criteria for the application of the qualified immunity, the language of the statute would have clearly reflected this intent." Smith v. Our Lady of the Lake Hospital, Inc., 624 So.2d 1239, 1249 (La.App. 1st Cir.1993).
Resolution of this issue does not depend on an interpretation of whether the word "and" is disjunctive or conjunctive. The two statutory qualifications on the immunity must be read together and surely are not separate and distinct. Our finding is based on the synonymous construction we give the two statutory qualifications"without malice" and "in the reasonable belief that such action or recommendation is warranted by the facts known to [the committee member]." More particularly, we construe both these qualifications to mean "good faith." Given that construction, we thus use the short-hand expression "good faith" throughout the remainder of the opinion when referring to the "reasonable belief qualification.
Our construction of LSA-R.S. 13:3715.3(C) as imposing an integrated, "good faith" standard is bolstered by the jurisprudence construing similar qualified immunity provisions. The courts have recognized that the same legal standard that applies to statutes having an express lack of "malice" requirement also applies to statutes having only a "good faith" requirement. Harris v. Bellin Memorial Hospital, 13 F.3d 1082, 1087 (7th Cir.1994) (citing Qasem v. Kozarek, 716 F.2d 1172, 1176-77 (7th Cir.1983)). Simply put, the courts have recognized that, in this context, good faithreasonable beliefis simply the flip-side of malice.
*749 Our construction of LSA-R.S. 13:3715.3(C) as imposing an integrated, "good faith" standard is based on the jurisprudence defining these qualifying terms "without malice" and "good faith" as synonymous in the conditional privilege context. In that context, courts have held that "[g]ood faith or lack of malice does not mean lack of hostility or ill feeling." Rouly v. Enserch Corp., 835 F.2d 1127, 1130 (5th Cir.1988). Instead, courts have held that "`good faith' means having reasonable grounds for believing that the statement is correct, but proof of ultimate truth is not necessarily required." Hines v. Arkansas Louisiana Gas Co., 613 So.2d 646, 656 (La.App. 2d Cir.), writ denied, 617 So.2d 932 (La.1993). "`Only when lack of such reasonable grounds is found can it be said that the person uttering the statement is actuated by malice or ill will.'" Clements v. Ryan, 382 So.2d 279, 282 (La.App. 4th Cir.1980) (quoting Ward v. Sears, Roebuck & Co., 339 So.2d 1255, 1261 (La.App. 1st Cir.1976)).[18]
Another definitional approach is to avoid altogether attempting to define the overused term "malice." Under this approach, the conditional privilege is abused "if [the actor] does not act for the purpose of protecting the interest for the protection of which the privilege is given." Restatement (Second) of Torts § 603; Prosser & Keeton on Torts, supra at § 115, p. 834 ("privilege is lost if the publication is not made primarily for the purpose of furthering the interest which is entitled to protection").
Both of these approaches have been employed by courts in defining "malice" and lack of "good faith" in the context of qualified peer review immunity statutes similar to LSA-R.S. 13:3715.3(C). Employing the latter approach of focusing on whether the motivating purpose was something other than that for which the privilege was intended to protect, courts have defined "malice" or lack of "good faith" to mean "a primary purpose other than the safeguarding of patients." Scappatura v. Baptist Hospital of Phoenix, 120 Ariz. 204, 584 P.2d 1195, 1201 (App.1978) (emphasis in original); Gilbert v. Board of Medical Examiners of State of Arizona, 155 Ariz. 169, 745 P.2d 617, 626 (App.1987); Cooper v. Delaware Valley Medical Center, 428 Pa.Super. 1, 630 A.2d 1, 10 (1993), appeal granted, 639 A.2d 28 (Pa.1994); Harris v. Bellin Memorial Hospital, 13 F.3d 1082, 1090 (7th Cir.1994). Employing the former approach and tailoring the definition to fit the qualified immunity provision, courts have found that lack of malice or good faith can be proven by establishing a reasonable basis for the conduct. See Maewal v. Adventist Health Systems/Sunbelt, Inc., 868 S.W.2d 886, 893 (Tex.App.Fort Worth 1993) (defining malice in Texas peer review immunity provision as "knowledge that an allegation is false or with reckless disregard for whether the allegation is false").
Formulating an integrated standard for LSA-R.S. 13:3715.3(C), we find that lack of "malice" and "good faith" exists in this context when the defendants-peer review committee members are shown to have a reasonable basis for their action or recommendation made in the course of the peer review process. We note that our formulation is consistent with that set forth in the federal HCQIA counterpart provision.
Under the federal HCQIA, the standard is primarily one of objective reasonableness to be determined by reviewing "the sufficiency of the basis for the defendants' actions." Austin v. McNamara, 979 F.2d 728, 734 (9th Cir.1992); Smith v. Ricks, 798 F.Supp. 605, 610 (N.D.Cal.1992) (requiring review be conducted with "reasonable belief that the action was in furtherance of quality health care"); Fobbs v. Holy Cross Health *750 System Corp., 789 F.Supp. 1054, 1069 (E.D.Cal.1992) (requiring defendants act with "objectively reasonable belief that their decision was warranted). Citing the legislative history, the Austin court points out that this standard of objective reasonableness was adopted by Congress so as to avoid the misinterpretation that might have resulted from requiring inquiry only into the subjective "good faith" of the peer review committee members. 979 F.2d at 734. Moreover, the legislative history reflects that the objective reasonableness standard will be met "`if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their actions would restrict incompetent behavior or would protect patients.'" Id. (emphasis in original); see generally R. Adler, Stalking the Rogue Physician: An Analysis of the Health Care Quality Improvement Act, 28 Am.Bus.L.J. 683, 720 n. 181 (1991).
Nonetheless, we note that the qualifying provisions of both the state statutes and the federal HCQIA have been recognized to involve, at least in part, an element of subjective intent. See J. Blumstein & F. Sloan, Antitrust and Hospital Peer Review, 51 J. Law & Contemp. Probs. 7, 83 n. 598 (1988) (noting HCQIA "reasonable belief" standard is designed to embrace both a subjective and an objective good faith test); Harris, 13 F.3d at 1087 (citing Campbell, 252 N.W.2d at 586-87; Gilbert, 745 P.2d at 626; Scappatura, 584 P.2d at 1201). As the court in Harris put it, "good faith" and "malice" involve, at least in part, a subjective inquiry. 13 F.3d at 1087.
Summing up, we construe LSA-R.S. 13:3715.3(C) as creating an affirmative defense to civil liability for peer review committee member's actions taken in good faith and without malice. In determining the applicability of the qualified immunity, a court must engage in a two-step analysis. First, the court must determine whether the defendants are peer review committee members whose actions on which liability is premised were undertaken as part of the peer review process. Second, if so, it must be determined whether there was an abuse of that process. As to the latter determination, while it generally involves a factual issue for the jury, it may be made at the summary judgment stage provided the requisite lack of a material factual issue is shown and reasonable persons could not differ. Lastly, the burden of establishing the lack of good faith or the presence of malice is on the plaintiff-physician.

IV.
With the above principles in mind, we turn our attention to the crucial question before us of whether Defendants acted without malice and in good faith in the peer review process which resulted in stripping Dr. Smith of his staff privileges. Defendants contend that this is not a factual dispute, but rather a legal question of whether their termination of Dr. Smith was reasonable based on the undisputed facts, and that summary judgment is thus appropriate. Conversely, Dr. Smith contends that this determination involves questions of the committee members' subjective intent and knowledge, and requires weighing of evidence and making credibility calls, all of which are inappropriate for summary judgment disposition. Agreeing with Dr. Smith, the court of appeal found summary judgment inappropriate here based simply on settled rules for summary judgment. Although we agree with Defendants, we briefly digress to review the settled summary judgment principles on which the court of appeal relied to reach a contrary result before progressing to the merits of the substantive issue before us.
Summary judgments are reviewed on appeal de novo. Schroeder v. Board of Supervisors of Louisiana State University, 591 So.2d 342, 345 (La.1991). An appellate court thus asks the same questions as does the trial court in determining whether summary judgment is appropriate: whether there is any genuine issue of material fact, and whether the mover-appellant is entitled to judgment as a matter of law. McCrae v. Hankins, 720 F.2d 863, 865 (5th Cir.1983); see Wright, Miller & Kane, Federal Practice and Procedure, § 2716 (Supp.1991). "Stated conversely, [summary judgment] should be denied if there is (1) a genuine issue of fact and (2) it is material to the case." Brown *751 v. B & G Crane Service, Inc., 172 So.2d 708, 710 (La.App. 4th Cir.1965).
A "genuine issue" is a "triable issue." Toups v. Hawkins, 518 So.2d 1077, 1079 (La.App. 5th Cir.1987) (citing Brown, supra). More precisely, "[a]n issue is genuine if reasonable persons could disagree. If on the state of the evidence, reasonable persons could reach only one conclusion, there is no need for a trial on that issue. Summary judgment is the means for disposing of such meretricious disputes." W. Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 481 (1983). In determining whether an issue is "genuine," courts cannot consider the merits, make credibility determinations, evaluate testimony or weigh evidence. Simon v. Fasig-Tipton Co. of New York, 524 So.2d 788, 791 (La.App. 3d Cir.), writs denied, 525 So.2d 1048, 1049 (La.1988); Pace v. Zilka, 484 So.2d 771 (La.App. 1st Cir.), writ denied, 488 So.2d 691 (La.1986); Mecom v. Mobil Oil Corp., 299 So.2d 380, 386 (La.App. 3d Cir.), writ denied, 302 So.2d 308 (La.1974). "Formal allegations without substance should be closely scrutinized to determine if they truly do reveal genuine issues of fact." Brown, 172 So.2d at 710; Sally Beauty Co. v. Barney, 442 So.2d 820, 822 (La.App. 4th Cir.1983).
A fact is "material" when its existence or nonexistence may be essential to plaintiff's cause of action under the applicable theory of recovery. Penalber v. Blount, 550 So.2d 577, 583 (La.1989). "[F]acts are material if they potentially insure or preclude recovery, affect a litigant's ultimate success, or determine the outcome of the legal dispute." South Louisiana Bank v. Williams, 591 So.2d 375, 377 (La.App. 3d Cir.1991), writs denied, 596 So.2d 211 (La.1992). Simply put, a "material" fact is one that would matter on the trial on the merits. Any doubt as to a dispute regarding a material issue of fact must be resolved against granting the motion and in favor of a trial on the merits. Sassone v. Elder, 626 So.2d 345, 352 (La. 1993); Industrial Sand and Abrasives, Inc. v. Louisville and Nashville Railroad Co., 427 So.2d 1152, 1153-54 (La.1983) (collecting cases); McCoy v. Physicians & Surgeons Hospital, Inc., 452 So.2d 308, 310 (La.App. 2d Cir.), writ denied, 457 So.2d 1194 (La. 1984) (noting that "[s]ummary judgment may not be used as a substitute for trial").
Because the summary judgment device deprives a party of a trial on the merits, Louisiana courts "cautiously and sparingly" employ it. Sassone, 626 So.2d at 352; Penalber, 550 So.2d at 583; Pace, 484 So.2d at 773. Indeed, as we recently recognized, in Louisiana "there is a strong preference for full trial on the merits in non-defamation cases." Sassone, 626 So.2d at 352.
Summary judgment is seldom appropriate for determinations based on subjective facts, such as motive, intent, good faith, knowledge and malice. Penalber, 550 So.2d at 583.[19] As we put it in Penalber, summary judgment "is rarely appropriate for a determination based on subjective facts." 550 So.2d at 583 (emphasis supplied). Nonetheless, Louisiana courts have recognized that, while "rare", summary judgment may be granted on subjective intent issues when no issue of material fact exists concerning the pertinent intent. Simoneaux v. E.I. du Pont de Nemours and Co., 483 So.2d 908, 912 (La.1986) (holding that "[s]ummary judgment is an appropriate method for disposing of a case wherein intent is a critical question"); Carter v. BRMAP, 591 So.2d 1184, 1188 (La. App. 1st Cir.1991); Fabre v. Kaiser Aluminum & Chemical Corp., 499 So.2d 1239 (La. App. 4th Cir.1986); Sally Beauty Co. v. Barney, 442 So.2d 820, 822 (La.App. 4th Cir. *752 1983) (finding intent clear under facts of case).
Procedurally, the court's first task on a motion for summary judgment is determining whether the moving party's supporting documentspleadings, depositions, answers to interrogatories, admissions and affidavitsare sufficient to resolve all material factual issues. LSA-C.C.P. Art. 966(B); Sanders v. Hercules Sheet Metal, Inc., 385 So.2d 772, 775 (La.1980). "To satisfy this burden, the mover must meet a strict standard of showing that it is quite clear as to what is the truth and that there has been excluded any real doubt as to the existence of a genuine issue of material fact." Industrial Sand and Abrasives, Inc. v. Louisville and Nashville Railroad Co., 427 So.2d 1152, 1154 (La.1983). In making this determination, the mover's supporting documents must be closely scrutinized and the non-mover's indulgently treated. Vermilion Corp. v. Vaughn, 397 So.2d 490, 493 (La.1981). Since the moving party bears the burden of proving the lack of a material issue of fact, inferences to be drawn from the underlying facts before the court must be viewed in light most favorable to the non-moving party. Schroeder v. Board of Supervisors of Louisiana State University, 591 So.2d 342, 345 (La.1991); Vermilion, 397 So.2d at 493; Pace, 484 So.2d at 773.
If the court determines that the moving party has met this onerous burden, the burden shifts to the non-moving party to present evidence demonstrating that material factual issues remain. Sanders, supra. LSA-C.C.P. Art. 967 outlines the non-moving party's burden of production as follows:
When a motion for summary judgment is made and supported ... an adverse party may not rest on the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided above, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him.
As this court has oft-stated, summary judgment may be granted when reasonable minds must inevitably conclude that the mover is entitled to judgment on the facts before the court. Sanders, 385 So.2d at 775; Chaisson v. Domingue, 372 So.2d 1225, 1227 (La.1979); Cates v. Beauregard Electric Cooperative, Inc., 328 So.2d 367, 370 (La. 1976), cert. denied, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976); see also Johnson v. Edmonston, 383 So.2d 1277, 1281 (La.App. 1st Cir.1980). Likewise, summary judgment is appropriate when all the relevant facts are marshalled before the court, the marshalled facts are undisputed, and the only issue is the ultimate conclusion to be drawn from those facts. Cates, 328 So.2d at 370 (reasoning that "[f]rom the uncontroverted facts before us, we can reach no other conclusion under the present state of the law" to resolve contributory negligence issue on summary judgment); Sally Beauty Co. v. Barney, 442 So.2d 820, 822 (La.App. 4th Cir.1983) (summary judgment granted on intent issue when "no uncertainties that require the trial court to go beyond the evidence"); Johnson v. Edmonston, 383 So.2d 1277, 1281 (La.App. 1st Cir.1980) (summary judgment appropriate when based on review of undisputed facts reasonable men could only conclude movers were not negligent); Hamilton v. State Farm Mutual Automobile Ins. Co., 364 So.2d 215, 218 (La.App. 3d Cir.1978), writ denied, 366 So.2d 915 (La.1979) (insurer's summary judgment motion granted on residency issue where evidence before court "without dispute and contains every fact material and necessary to a determination of plaintiff's residency at the time of accident"); Bouterie v. Kleinpeter, 289 So.2d 163, 168 (La.App. 1st Cir.1973), writ denied, 293 So.2d 169 (La. 1974) (noting that merely because dispute exists as to conclusion to be drawn from facts does not preclude summary judgment); Ocmond v. Eserman, 259 So.2d 600 (La.App. 4th Cir.), writ denied, 261 La. 825, 261 So.2d 230 (1972) (finding summary judgment evidence presented no factual contradictions "only conflicting conclusions based on those facts"). Such is the case here.

V.
As we outlined in detail above, the relevant facts here are the details of the four-year long peer review process, which culminated *753 in Dr. Smith's staff privileges being terminated. The sole issue presented is whether, from those facts, the conclusion can be drawn that the Defendants acted with malice or without good faith in terminating Dr. Smith's staff privileges.
In a disciplined-doctor's action against peer review committee members, like this one, the doctor will seldom, if ever, be able to uncover direct evidence of the peer review committee members' improper motive or intent. Instead, the disciplined-doctor's proof will consist of a broad array of circumstantial evidence regarding alleged defects in the peer review process, the committee members' knowledge, and the reasons touted for the disciplinary action taken. Dr. Smith's proof offered in opposition to Defendants' motion for summary judgment fits that pattern; he advances six such alleged abuses of the peer review process as providing a sufficient basis for inferring "malice" and lack of "good faith." We address each of Dr. Smith's allegations in turn.
First, Dr. Smith alleges that the entire investigation into his mortality statistics was motivated by something other than his incompetence and that this evidences Defendants' lack of good faith. In support of this allegation, Dr. Smith relies on the affidavits of several local physicians attesting to Dr. Smith's adherence to acceptable standards of practice for his specialty and questioning the correctness of his termination. However, "[t]he affidavits of physicians questioning the propriety of the disciplinary action do not support the allegations of bad faith and malice; they simply question the medical judgment upon which the disciplinary action was based." Everett v. St. Ansgar Hospital, 974 F.2d 77, 80 (8th Cir.1992); Onat v. Penobscot Bay Medical Center, 574 A.2d 872, 874 (Me.1990) ("[p]rofessional disagreement over the appropriate standard of care does not per se constitute malice"); Gilbert v. Board of Medical Examiners of State of Arizona, 155 Ariz. 169, 745 P.2d 617, 627 (App.1987) ("[p]rofessional criticism or disapproval does not constitute malice"). The issue here is not whether the peer review committee reached the correct result, but rather whether they reached a reasonable result. Fobbs v. Holy Cross Health System Corp., 789 F.Supp. 1054, 1069 (E.D.Cal.1992).
Moreover, Defendants counter Dr. Smith's allegations of improper impetus for the mortality study with deposition testimony establishing a plausible reason for beginning the study. The testimony reveals that the study was conducted in connection with a quarterly educational program and that as part of the study a "blind" surveyone not focusing on any particular doctorwas conducted. The survey results, however, showed that Dr. Smith's mortality percentages were significantly higher than the other doctors and thus served as an impetus for invoking the peer review process. Defendants' showing, which Dr. Smith failed to rebut with specific evidence, establishes that the peer review here was invoked as a result of a normal quality assurance survey conducted by the hospital, which revealed a significant variance in Dr. Smith's mortality statistics from that of the other doctors, and thus evidences a lack of malice. P. Rosen, Comment, Medical Staff Peer Review: Qualifying the Qualified Privilege Provision, 27 Loy.L.A.L.Rev. 357, 380-83 (1993) (noting that a complaint initiated inside normal channels of quality assurance review evidences a lack of malice); see also McKeel v. Armstrong, 96 N.C.App. 401, 386 S.E.2d 60, 64 (1989) (noting that use of "blind" study contributed to "objectivity and fairness" of peer review process).
Nor does the fact that Dr. Smith's chief competitor, Dr. Berry, prepared the mortality reports which prompted the peer review process suffice to infer malice. The mere involvement of a competitor in the process does not, in and of itself, suffice to infer malice. McKeel, 386 S.E.2d at 64. Moreover, Defendants produced evidence establishing that Dr. Berry's role in the process was minimal. This allegation is thus without factual support.
Dr. Smith alleges, second, that Defendants' reliance on the crude mortality statistics, despite their knowledge of the deficiencies in such statistics, was sufficient to infer lack of good faith. More particularly, Dr. Smith alleges that the most significant defect regarding the mortality statistics was the failure to take into account the variable *754 of patient risks.[20] This defect, Dr. Smith urges, was substantial because he had a significant number of "high risk" patients.
A strikingly similar alleged defect in a peer review process was found to lack factual foundation in Harris v. Bellin Memorial Hospital, 13 F.3d 1082 (7th Cir.1994). Addressing this alleged defect, the Harris court reasoned:
[P]laintiff places the most reliance on defendants' failure to perform any statistical analysis on his seemingly high (three to four time the national average) mortality rates. Plaintiff argues that his patients were at higher risk of post-operative complications and death than the general patient population, but that the defendants did not properly take this into account. In particular, plaintiff believes that a formal statistical analysis ought to have been performed on the "raw data" (comparing the mortality rate to the national average).... It is not clear, however, what information a statistical analysis would have conveyed to the [peer review committee], in part because during this litigation plaintiff has offered no statistical analysis of his own.... In the absence of any evidence that such an analysis would even have been helpful to defendants, let alone crucial to a fair evaluation of his surgical skills, plaintiff's mere desire that the review would have been conducted differently does not support an inference that defendants lacked good faith.
13 F.3d at 1088-89. The same reasoning applies here.
Another weakness in Dr. Smith's allegation regarding Defendants' reliance on the mortality statistics is that it ignores not only that the statistics served solely as an impetus for invoking the peer review process, but also that an in-depth internal and external peer review process followed. During that lengthy process, Dr. Smith's mortality cases were reviewed on a case-by-case basis by both physicians on the OLOL staff as well as by the Society's Subcommittee members and resulted in a voluminous record. See McKeel, 386 S.E.2d at 64 (noting that the fact investigation took over two years to conduct and produced voluminous data supported objectivity and fairness of process).
Dr. Smith alleges, third, that Defendants' reliance on the third-party, external peer review conducted by the Society in preference to the internal review conducted by his peers evidences a lack of good faith. The use of independent, third-party peer review services, contrary to Dr. Smith's contention, ensures that a hospital's peer review process is held to be fair and objective. T. Nodzenski, Where Is the Quality in the Health Care Quality Improvement Act of 1986?, 22 Loy. U.Chi.L.J. 361, 402, 405 n. 245 (1991) (noting that resort to independent outside reviewers is especially warranted in cases which are likely to be litigated); Everett v. Franciscan Sisters Healthcare, Inc., 882 F.2d 1383, 1386 (8th Cir.1989) ("resort to uninvolved impartial medical authorities guaranteed discreet and circumspect inquiry"); Veldhuis v. Allan, 164 Mich.App. 131, 416 N.W.2d 347, 350 (1987) (citing use of three outside experts as supporting reasonableness of peer review process). Indeed, one court cited the fact that the hospital doctors, after conducting an internal investigation and opining that they lacked the expertise to evaluate the plaintiff's work, opted to recruit outside experts as evidencing that "the intrahospital proceedings fairmindedly sought to assess plaintiff's competency." Regualos v. Community Hospital, 140 Mich.App. 455, 364 N.W.2d 723, 727 (1985). Defendants' resort to the Society, an independent, outside peer review committee, to review this matter thus undercuts, rather than supports, any finding of malice or bad faith.
Dr. Smith alleges, fourth, that Defendants improperly tainted the Society's review process by contacting the Society by phone and by mail on various occasions during its review and by supplying the Society with, among other things, the crude mortality statistics. As noted above, no inference of malice may be made based simply on Defendants supplying the mortality statistics to the Society, given the subsequent case-by-case *755 reviews of Dr. Smith's patients' records. Harris, 13 F.3d at 1088-89 n. 7. As to the alleged improper communications between OLOL representatives and the Society, this allegation is rebutted by the Society Subcommittee Members' affidavits. The affidavit of Dr. Waldhausen, one of the committee members, is representative; he attests that "[t]he conclusions of the report were based on a review of the medical records and histories of patients treated by Prentiss E. Smith, M.D. at [OLOL]; an interview with Dr. Smith; and the combined expertise and experience of the subcommittee members. At no time did any representative of [OLOL] attempt to influence the subcommittee's work or conclusions." See also Smith v. Our Lady of the Lake Hospital, Inc., 960 F.2d 439, 442 (5th Cir.1992) (noting that "nothing in the record indicates that those communications were inherently fraudulent"). Dr. Smith failed to offer any concrete evidence in rebuttal, and his conclusory allegations regarding Defendants' alleged tainting of the Society's decision are insufficient to withstand summary judgment.
Dr. Smith alleges, fifth, that the atmosphere of the Executive Committee meeting at which his termination was discussed was one of a "lynching" and cites in support the deposition testimony of Dr. Kraft. Dr. Kraft, however, expressly retracted his characterization of the meeting as a "lynching," stating that this was "a poor choice of words." Dr. Kraft further testified that he "ha[d] no data that would indicate from any words that were said that anyone was out to get Dr. Smith." In any event, the atmosphere of a meeting at which an issue as serious as terminating a physician's staff privileges is discussed, by nature, is an unpleasant one. Indeed, the position of peer review committee members has been described as an "unenviable" one. Cooper, 630 A.2d at 7-8 (quoting Jorstad supra); see Scappatura v. Baptist Hospital of Phoenix, 120 Ariz. 204, 584 P.2d 1195, 1201 (App.1978) (noting that peer review activity is likely to generate bad feelings and result in unpopularity). Especially apt here is the following comment:
All the allegations raised by plaintiff point to areas of the internal investigation process where possible conflicts of interest could arise. As in almost any situation of this nature, opportunities existed here to compromise the investigation if the persons involved had been motivated by malicious intent. In this case, however, plaintiff has failed to produce any evidence of such intent.
McKeel, 386 S.E.2d at 64; see also Limjoco v. Schenck, 169 Wis.2d 703, 486 N.W.2d 567, 571 (App.), review denied, 491 N.W.2d 768 (1992) (finding insufficient evidence to raise genuine issue of fact regarding alleged improper motives of "grudge or vendetta" or economic gain); Harris, 13 F.3d at 1089 (finding "bare allegation of misconduct" insufficient to infer lack of good faith); Smith v. Ricks, 798 F.Supp. 605, 611 (N.D.Cal.1992) (rejecting broad accusation of review proceeding being akin to a "kangaroo court"). This allegation thus lacks record support.
Lastly, Dr. Smith alleges that Defendants failed in several respects to comply with the OLOL bylaws and that this failure warrants an inference of malice. Defendants respond that while the bylaws may not have been strictly complied with in every instance, any alleged defects were cured by the fact that Dr. Smith was offered review by committee after committee. While there is no Louisiana jurisprudence on point, the consensus among other jurisdictions on the issue of the effect of a hospital's failure to comply strictly with its bylaws is that a "substantial compliance" rule applies. Owens v. New Britian General Hospital, 32 Conn.App. 56, 627 A.2d 1373 (1993), aff'd, 229 Conn. 592, 643 A.2d 233 (1994); Friedman v. Memorial Hospital of South Bend, Inc., 523 N.E.2d 252 (Ind. App.1988); Even v. Longmont United Hospital Ass'n, 629 P.2d 1100, 1102 (Colo.App. 1981).
The substantial compliance rule is in accord with the purpose underlying a hospital's bylawsproviding a fair process, outside the judicial system, for adjudicating staff privilege issues. Owens, 627 A.2d at 1380. More particularly, "[t]he bylaws create a decision making process that affords a physician certain protections and assures that the hospital does not impose restrictions on or revoke a physician's staff privileges on the basis of unsupported accusations or on an arbitrary, *756 unreasonable or capricious basis." Id. at 1379. Expounding on the substantial compliance rule, the Owens court explained:
This standard presupposes that irregularities in procedural compliance will not constitute a breach of the bylaws unless the physician can establish that the hospital has failed to cure these lapses adequately or timely or that these lapses have been wilfully made or have otherwise prejudiced the outcome of the process. Because the central purpose of the bylaws is to provide procedural fairness in reaching decisions regarding staff privileges, merely "technical" violations or minor deviations in the procedures employed that do not result in material prejudice to the physician or otherwise undermine the result reached by the hospital will not rise to the level of "breaches" of the hospital's obligation to comply with its bylaws.
627 A.2d at 1380. Continuing, the court noted that the proceeding as a whole must be looked at to determine whether the bylaw requirements have been substantially complied with or whether the proceeding has been "fatally flawed by procedural irregularities." Id.
Adopting and applying that standard, we find that the OLOL bylaws were substantially complied with here based on the undisputed facts that Defendants constantly kept Dr. Smith abreast of the developments along the way, as evidenced by the numerous written correspondence sent to Dr. Smith,[21] and that Dr. Smith was afforded a substantial number of hearings and appeals. See Harris, 13 F.3d at 1090 (noting that "an imperfect investigation does not itself constitute one that was conducted in bad faith").
Concluding, we find that given the evidence of the good faith peer review efforts undertaken by Defendants over a four-year period and the voluminous record resulting therefrom, coupled with the lack of any specific factual showing by Dr. Smith of malice or lack of good faith, reasonable minds, viewing the evidence in Dr. Smith's favor, must inevitably conclude that Defendants acted "without malice and in the reasonable belief that such action or recommendation [was] warranted by the facts known to [them]" and are thus entitled to immunity from liability under LSA-R.S. 13:3715.3(C).

VI.
For the above reasons, the judgment of the court of appeal, reversing the district court's judgment granting summary judgment in favor of all defendants, is affirmed as to Our Lady of the Lake Hospital, Inc., d/b/a Our Lady of the Lake Regional Medical Center, and CVT Surgical Center, A Medical Corporation, and as to the claims asserted for injunctive relief. As to the remaining defendants, the judgment of the court of appeal is reversed and the district court judgment granting summary judgment in their favor is reinstated as to the claims for damages. We thus remand to the district court for further proceedings consistent with this opinion.
REVERSED IN PART; AFFIRMED IN PART; AND REMANDED.
LEMMON, J., concurs.
LEMMON, Judge, concurring.
However, once the individual staff members and doctors are dismissed by summary judgment based on the immunity conferred by La. 13:3715.3C, the corporate defendants who acted through the released individuals may be entitled to summary judgment on other grounds. Rehearing applicants may raise the issue by another motion for summary judgment.
NOTES
[*] Marcus, J., not on the panel. Rule IV, Part 2, § 3. Judge Shortess of the Court of Appeal, First Circuit sitting for Dennis, J.
[1] LSA-R.S. 13:3715.3(C) provides as follows:

No member of such committee shall be liable in damages to any person for any action taken or recommendation made within the scope of the functions of such committee if such committee member acts without malice and in the reasonable belief that such action or recommendation is warranted by the facts known to him. (Emphasis supplied).
[2] "Peer review" is the process by which physicians, hospitals and other health care providers review the performance of other physicians and, when warranted, discipline the reviewed physician for incompetence or unprofessional conduct.
[3] Dr. Smith, in his petition, emphasizes two things that this letter failed to mention. One, it failed to mention that the Executive Committee had adopted the Ad Hoc Committee's resolution that if at the end of the two-month period the situation had not sufficiently improved, Dr. Smith's privileges would be suspended. This allegation, however, overlooks that Dr. Smith was notified to that effect in writing on October 6, 1982. Two, it failed to mention the contemplated mortality survey. These two omissions, Dr. Smith alleges, mislead him and lulled him into not taking appropriate actions to retain his staff privileges.
[4] The first mention of the mortality survey was at an August 9, 1983 meeting of the Surgical/Dental Chief of Services. At this meeting, the mortality list of surgical deaths at OLOL during the months of June and July 1983 were reviewed. Dr. Laville, Chief of Surgical Services, reported that the Chiefs of General Surgery and Thoracic and Cardiovascular Surgery reviewed the deaths on their respective services and reported "no problems." While Dr. Smith cites this remark as evidencing that the mortality study was improperly motivated, Dr. Kraft's deposition testimony indicates that the remark was made in connection with a casual, monthly review. And, at this same monthly meeting. Dr. Laville further noted that there were three deaths following coronary artery bypass surgery and that the Chief of Thoracic and Cardiovascular Surgery, Dr. Berry, was surveying the mortality from coronary artery bypass surgery.
[5] Dr. Smith points out in his petition that the report was flawed in at least three respects. One, the report failed to take into account any variables such as patient age, severity of conditions, relative risks of the operations or whether the deaths could be attributed to other causes than the surgery; the report simply compared crude mortality statistics. This omission, Dr. Smith urges, was significant because many of his patients were "high risk." Two, the report failed to include four surgeons having higher mortality percentages than Dr. Smith. This latter omission, defendants explain, was because those surgeons performed too few procedures for their data to be statistically meaningful. Three, the report failed to assure that none of the patients of Dr. Smith's partner, Dr. McCool, were improperly attributed to Dr. Smith.
[6] These statistics were presented in the same format as the earlier report, but encompassed a more extensive time frame, covering the four year period of 1980 through 1983.
[7] The Society functions as an independent peer review body. It establishes a Standards and Ethics Committee to represent it in matters relating to standards of practice in thoracic and cardiovascular surgery. That committee responds on the Society's behalf to requests by hospitals to provide consulting services in the review and evaluation of thoracic and cardiovascular surgical personnel, procedures, equipment and systems.
[8] Those five questions were as follows:

1. Was the appropriateness of surgical risk evaluated prior to surgery?
2. Was the appropriateness of surgery indicated in general in the cases?
3. Was the pre-operative and post-operative care of patients involved of satisfactory quality in general?
4. Are these death rates within the limits of acceptable standards for the service?
5. Is it the opinion of the services that the physician involved has met the standard of practice of cardiovascular surgery for this community?
[9] A "Tissue Committee" is one which "reviews the quality of surgery performed, and is commonly composed of a pathologist, a general surgeon, a surgical specialist, an internist, and a general practitioner." G. Gosfield, Comment, Medical Peer Review Protection in the Health Care Industry, 52 Temp.L.Q. 552, 565 (1979).
[10] While Dr. Smith urges that the Subcommittee's failure to review the cineangiograms was an error and offers deposition testimony of various local doctors in support of the position that a review of the cineangiograms is necessary to determine whether surgery was indicated, this testimony is undercut by the deposition testimony of Dr. George Lindesmith, a thoracic and cardiovascular surgeon from California who was Chairman of the Committee on Standards and Ethics of the Society of Thoracic Surgeons in 1984. He testified that "[i]f a review team decided that they did not have to look at the cineangiogram, I would respect that opinion. That isn't absolutely necessary."
[11] The record reflects that Dr. Smith expressly agreed to submit the matter for review to the Society, signing an agreement entitled "Waiver of Possible Claims and Contract Not to Sue," which released the Society from any and all liability for their actions in reviewing the matter.
[12] The Society's seven conclusions were as follows:

1. There is no evidence that Dr. Smith has undertaken any continuing education in the area of cardiovascular and thoracic surgery for the past five years.
2. There has been inappropriate selection of many patients for operation, based on the capabilities and experience of Dr. Smith and his associate. A number of patients had severely depress ejection fraction or other evidence for severely compromised ventricular function. There were also some patients operated upon with minimal symptoms and coronary disease in whom the indications for operation could be questioned.
3. There is abundant evidence that some patients are receiving an inadequate degree of revascularization with significantly diseased major vessels not being bypassed. There were a number of single and double coronary artery bypass procedures performed with minimal documentation of the indications.
4. There is a heavy, virtually complete reliance on perfusionists for such factors as myocardial protection and the entire conduct of the extracorporeal perfusion.
5. Myocardial protection appears inadequate, and Dr. Smith has little understanding of how it should be appropriately conducted. Similarly, he has poor understanding of how to remove air from the heart.
6. There is a high perioperative mortality (coronary artery bypass surgery 11%, valve replacement 24%). There is a high postoperative incidence of bleeding (7.6%) and tamponade. There is a high incidence of stroke and high incidence of myocardial failure as manifested by the need for intra-aortic balloon pumping.
7. There is poor documentation of indications for operation and events occurring during the operative and postoperative periods.
[13] The monitoring suggested was to include, but not be limited to, the following:

1. Second surgical opinion, by a surgeon acceptable to the Executive Committee, on all proposed surgical procedures.
2. Operating Room supervision by another Cardiovascular surgeon, acceptable to the Executive Committee, on all procedures.
3. Ongoing statistical analysis of Dr. Smith's surgical results.
[14] The only defense asserted in the defendants' motion for summary judgment is the qualified immunity provided by LSA-R.S. 13:3715.3(C). Consequently, we are not presented with and do not consider any other defenses that might be raised by the corporate defendants in this case.
[15] While a distinction can be made between the remaining individual defendants in that some of them are not physicians, this is a distinction without a difference. The non-physician defendants, albeit technically not plaintiff-physician's "peers," were all members of one or more of the committees constituting the peer review process that culminated in the termination of plaintiff's staff privileges. We thus decline to read into LSA-R.S. 13:3715.3(C) a "physician-only" limitation on the term "[committee] member."
[16] An abundance of Louisiana jurisprudence exists recognizing the appropriateness of summary judgment disposition of this issue in the conditional privilege context. Indeed, in Farria v. La Bonne Terrebonne of Houma, Inc., 476 So.2d 474 (La.App. 1st Cir.1985), the court expressly held that summary judgment is an appropriate procedural device for resolving this issue. Cases in which Louisiana courts have granted summary judgment on this issue include the following: Wright v. Dollar General Corp., 602 So.2d 772 (La.App. 2d Cir.), writ denied, 606 So.2d 538 (La.1992); Miller-Douglas v. Keller, 579 So.2d 491 (La.App. 4th Cir.), writ denied, 581 So.2d 709 (La.1991); Roberts v. Louisiana Bank & Trust Co., 550 So.2d 809 (La.App. 2d Cir.), writ denied, 552 So.2d 398 (La.1989); Newman v. General Motors Corp., 524 So.2d 207 (La.App. 4th Cir. 1988); O'Dell v. Deich, 496 So.2d 1074 (La.App. 4th Cir.1986); Thibodeaux v. Southwest Louisiana Hospital Ass'n, 488 So.2d 743 (La.App. 3d Cir.1986); White v. Baker Manor Nursing Home, Inc., 400 So.2d 1168 (La.App. 1st Cir.), writ denied, 403 So.2d 68 (La.1981).
[17] See also M. Colantonio, The Health Care Quality Improvement Act of 1986 and Its Impact on Hospital Law, 91 W.Va.L.Rev. 91, 109 (1988) (noting that "HCQIA's goals will only be accomplished if a court utilizes the Act's presumption... and then resolves the action on a motion to dismiss or a motion for summary judgment"); J. Bierig & R. Portman, The Health Care Quality Improvement Act of 1986, 32 St. Louis U.L.J. 977, 1003 n. 145 (1988) (noting that Congressional goal of expeditious resolution of immunity issue could be frustrated by even a "mini-trial" on the issue); C. Scott, Medical Peer Review, Antitrust, and the Effect of Statutory Reform, 50 Md.L.Rev. 316, 373 (1991) (noting that legislative history of HCQIA reveals that "concerns over the threat of protracted litigation were as significant as those over the threat of actual liability").
[18] Courts in other jurisdictions similarly have held that the "malice" required to overcome the special-interest, conditional privilege is that required under New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), that is, "knowledge that an allegation is false or with reckless disregard for whether the allegation is false." Sibley v. Lutheran Hospital of Maryland, Inc., 871 F.2d 479, 484 (4th Cir.1989); Onat v. Penobscot Bay Medical Center, 574 A.2d 872, 874 (Me.1990) (requiring either actual malice, i.e., ill will, or implied malice, i.e., reckless disregard for the truth or falsity of the slanderous element); Maewal v. Adventist Health Systems/Sunbelt, Inc., 868 S.W.2d 886, 893 (Tex. App.Forth Worth 1993); see also Restatement (Second) of Torts § 600 (adopting this definition as one of the circumstances constituting an abuse of the conditional privilege).
[19] See also Roberts v. Orpheum Corp., 630 So.2d 914, 916 (La.App. 4th Cir.1993); Jarrell v. Carter, 632 So.2d 321 (La.App. 1st Cir.1993), writ denied, 94-C-0700 (La. 4/29/94); 637 So.2d 467; Dixon v. Perlman, 528 So.2d 637 (La.App. 2d Cir.1988); Simon v. Fasig-Tipton Co. of New York, 524 So.2d 788, 791 (La.App. 3d Cir.), writs denied, 525 So.2d 1048, 1049 (La.1988); Johnson v. Hitchens, 518 So.2d 1154, 1156 (La.App. 4th Cir.1987) (collecting cases); Watson v. Cook, 427 So.2d 1312, 1316 (La.App. 2d Cir.1983); Sally Beauty Co. v. Barney, 442 So.2d 820, 822 (La. App. 4th Cir.1983); Ortego v. Ortego, 425 So.2d 1292 (La.App. 3d Cir.1982), writ denied, 429 So.2d 147 (La.1983); Roy & Roy v. Riddle, 187 So.2d 492 (La.App. 3d Cir.), writ denied, 249 La. 724, 190 So.2d 236 (1966).
[20] For a more detailed listing of the defects Dr. Smith alleges in the mortality statistics report, see Note 5, supra.
[21] While Dr. Smith takes issue with Defendants' failure to notify him that the charges of unprofessional conduct were still being considered and could form a basis for his termination, this allegation is without merit. See Note 3, supra. By correspondence dated October 6, 1982, he was notified that any further incidents of a similar nature could result in his termination. See E. Springer & H. Casale, Hospitals and the Disruptive Health Care PractitionerIs the Inability to Work with Others Enough to Warrant Exclusion, 24 Duq.L.Rev. 377, 409-10 (1985) (noting that courts have rejected allegation that past incidents of professional misconduct become "stale" and cannot be used in conjunction with additional incidents to establish cumulative basis for termination).