# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 09-0763


**MAYNE & MERTZ, INC.**

**VERSUS**

**SWEET LAKE LAND & OIL CO., L.L.C., ET AL.**

## CONSOLIDATED WITH

## 09-0764

**YUMA EXPLORATION AND PRODUCTION CO., INC.**

**VERSUS**

**MAYNE & MERTZ, INC.**


************

APPEAL FROM THE
THIRTY-FIRST JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON DAVIS, NOS. C-178-07 AND C-817-07
HONORABLE STEVE GUNNELL, DISTRICT JUDGE

************

**JIMMIE C. PETERS**
**JUDGE**

************

Court composed of Oswald A. Decuir, Jimmie C. Peters, and David E. Chatelain,*
Judges.


**AFFIRMED AS AMENDED.**

**Larry C. Hebert**
**Paul J. Hebert**
**David M. Kaufman**
**Ottinger Hebert, L.L.C.**


* Honorable David E. Chatelain participated in this decision by appointment of the Louisiana
Supreme Court as Judge Pro Tempore.

**P. O. Drawer 52606**
**Lafayette, LA 70505-2606**
**(337) 232-2606**
**COUNSEL FOR PLAINTIFF/APPELLANT**
**AND DEFENDANT/APPELLANT:**
 **Mayne & Mertz, Inc.**

**Thomas C. McKowen, IV**
**James C. Bates**
**Strain, Dennis & Bates, L.L.P.**
**318 St. Charles Street**
**Baton Rouge, LA 70802**
**(225) 343-0100**

**Tim M. Cassidy**
**Cassidy Law Firm**
**P.O. Box 1446**
**Jennings, LA 70546**
**(337) 824-7322**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
 **Yuma Exploration and Production Company, Inc.**
 **The Chalkley Exploration Group, L.L.C.**

PETERS, J.

This litigation involves the interpretation of a joint operating agreement entered into by a number of parties to develop and produce the oil, gas, and minerals under certain immovable property located in Jefferson Davis Parish, Louisiana. In these consolidated cases, Mayne & Mertz, Inc. (Mayne & Mertz) appeals the trial court's grant of a partial summary judgment in favor of Yuma Exploration and Production Co., Inc. (Yuma) and The Chalkley Exploration Group, L.L.C. (Chalkley), awarding the two entities a 2.60500 percent proportionate share of the net revenue produced from the HBY RB SUA, Mayne & Mertz, Inc.-Romero No. 1 Well (Romero well) from the time production began until October 31, 2008. For the following reasons, we amend the trial court judgment to reflect payment through October 10, 2008, instead of October 31, 2008, and affirm the trial court judgment as amended.

## DISCUSSION OF THE RECORD

By an October 27, 2005 order, the Louisiana Commissioner of Conservation created Unit HBY RB SUA (the Romero unit), with Mayne & Mertz as the designated unit operator. On February 15, 2006, twelve different entities, including Mayne & Mertz and Yuma, entered into the joint operating agreement at issue in this litigation. The twelve entities asserted in the joint operating agreement that they owned one hundred percent of the oil, gas, and mineral interests in the Romero unit and agreed that the purpose of joining together was to explore and develop various oil and gas leases and interests in that unit. The joint operating agreement listed Yuma's interest as a 2.60500 percent working interest that Yuma had acquired from two separate oil, gas, and mineral leases from the purported owner of part of the immovable property in the Romero unit, Sweet Lake Land & Oil Company, L.L.C. (Sweet Lake). Sweet Lake executed the first lease in favor of Yuma on March 29, 2005, and the second on

May 1, 2006. At some point after execution of the joint operating agreement, Yuma assigned one fourth of its interest to Chalkley.

The Romero well is located on the immovable property covered by the Romero unit and began producing on September 22, 2006. At some point thereafter, a dispute arose over the ownership of certain tracts contained in the properties governed by the joint operating agreement (hereinafter the disputed tracts). Because fourteen entities were claiming an ownership interest in the proceeds derived from the production attributable to the disputed tracts, Mayne & Mertz filed a concursus proceeding on March 12, 2007, to obtain a judgment directing the disbursement of the disputed funds. Concurrent with the filing of the concursus proceeding, Mayne & Mertz obtained authorization from the trial court to deposit the disputed proceeds into the registry of the court.

On October 3, 2007, Yuma filed a separate suit against Mayne & Mertz, requesting payment of its proportionate share of revenues produced by the Romero well. Specifically, Yuma alleged that, even if its title was ultimately found to be invalid, it was entitled to its share of revenues from the date production began until ninety days after a final determination of its title failure.[1] The two suits were consolidated on March 5, 2008.

On May 1, 2008, nine defendants[2] (hereinafter the Mallett defendants) filed a motion for summary judgment, seeking to be awarded the royalties attributable to the

---

[1]This litigation includes numerous other issues yet to be resolved and has involved various procedural matters not relevant to this appeal.

[2]The nine defendants are Kelly Bree Mallett Lowe, Lacie Beth Mallett Corbello, Susanne Belaire Mallett, Belinda Mallett Delome Felsenthal, Rose Regina Flournoy Mallett, Margaret Mallet Bebee, Brandi Renee Romero, Wayne Wright Thibodeaux, and Clint Fontenot.

2

disputed tracts. Yuma, Chalkley, and Sweet Lake opposed this motion for summary disposition.

On July 28, 2008, Mayne & Mertz filed a motion for partial summary judgment seeking a declaration that Sweet Lake had no ownership interest in the disputed tracts, and, therefore, neither Sweet Lake, Yuma, nor Chalkley were entitled to royalty or revenue interests in the Romero well. After a September 16, 2008 hearing wherein Yuma did not oppose Mayne & Mertz's motion, the trial court rendered a partial summary judgment in favor of Mayne & Mertz. When reduced to writing on October 10, 2008, the partial summary judgment held that Sweet Lake never owned the disputed tracts,

> and that as a consequence thereof Sweet Lake is not entitled to any of the royalty revenues from the Romero Well, the unit well for the above described unit, based on ownership of the said Disputed Tracts and that Yuma, Chalkley and any of their assigns and any other lessee of Sweet Lake are not entitled to any of the working interest revenues from the Romero Well based on their ownership of any lease covering and affecting the Disputed Tracts from Sweet Lake or as a result of Sweet Lake's claim of ownership of the Disputed Tracts.

However, this judgment explicitly reserved Yuma's and Chalkley's claims under the joint operating agreement.

On October 31, 2008, the trial court granted the Mallett defendants' motion for partial summary judgment as well. In that partial summary judgment, the trial court rejected Sweet Lake's claims to the disputed tracts, recognized the claims of the Mallett defendants to the disputed tracts, and ruled that the Mallett defendants' interests "are to be further designated among the individual landowners by a division order or orders or by consent."

Yuma and Chalkley filed their own motion for summary judgment on November 17, 2008. In that motion, they asserted that, regardless of the invalid title

3

issue, under the terms of the joint operating agreement they were entitled to receive a 2.60500 percent proportionate share of the revenues, less expenses, from the Romero well from production until October 31, 2008.

Mayne & Mertz responded by filing its own motion for partial summary judgment on December 5, 2008, wherein it asserted that the joint operating agreement prohibited payment of revenues to Yuma because of Yuma's title failure; that the joint operating agreement is ambiguous, and that it was never the intent of the parties that Yuma would receive revenues during the pendency of the concursus proceeding; that the joint operating agreement is null and void; and that Yuma entered the joint operating agreement in legal bad faith and, therefore, is not entitled to recover under its terms.

On January 22, 2009, the trial court denied Mayne & Mertz's motion and entered a partial summary judgment in favor of Yuma and Chalkley, holding

> that Mayne & Mertz is obligated under the Joint Operating Agreement between the parties to pay Yuma and Chalkley their 2.60500% proportionate share of revenue, less expenses, in regards to the HBY RB SUA, Mayne & Mertz, Inc. - Romero No. 1 Well, until October 31, 2008, and awarding Yuma and Chalkley their 100% share of all sums held (or to be deposited) in the Court Registry in Docket Number C-178-07 in regards to the leasehold interest.

The trial court reserved the determination of the amount of revenue, less expenses, and the determination of attorney fees. It is from this partial summary judgment in favor of Yuma and Chalkley that Mayne & Mertz now appeals, asserting three assignments of error:

1. The Trial Court committed legal error in granting the Motion for Summary Judgment of Yuma and denying the Motion for Summary Judgment of Mayne & Mertz.

4

2. The Trial Court committed legal error in interpreting the provisions of the Romero Joint Operating Agreement in favor of Yuma.

3. The Trial Court committed legal error in awarding revenues to Yuma until October 31, 2008.

**OPINION**

The motion for summary judgment is a procedural device to avoid a full-scale trial when there is no genuine issue of material fact. *Kay v. Carter*, 150 So.2d 27 (La.1963). Summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action, except certain domestic actions; the procedure is favored and shall be construed to accomplish those ends. La.Code Civ.P. art. 966(A)(2); *Racine v. Moon's Towing,* 01-2837 (La. 5/14/02), 817 So.2d 21. The burden of proof on the motion for summary judgment remains with the movant. La.Code Civ.P. art. 966(C)(2).

> However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.

La.Code Civ.P. art. 966(C)(2). The motion should be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. La.Code Civ.P. art. 966(B).

> A fact is "material" when its existence or nonexistence may be essential to plaintiff's cause of action under the applicable theory of recovery. "[F]acts are material if they potentially insure or preclude recovery, affect a litigant's ultimate success, or determine the outcome

5

> of the legal dispute." Simply put, a "material" fact is one that would matter on the trial on the merits. Any doubt as to a dispute regarding a material issue of fact must be resolved against granting the motion and in favor of a trial on the merits.

*Smith v. Our Lady of the Lake Hosp., Inc.*, 93-2512, p. 27 (La. 7/5/94), 639 So.2d 730, 751 (citations omitted).

In determining whether a fact is material, we must consider the substantive law governing the litigation. *Davenport v. Albertson's, Inc.*, 00-685 (La.App. 3 Cir. 12/6/00), 774 So.2d 340, *writ denied*, 01-73 (La. 3/23/01), 788 So.2d 427.

Appellate review of a summary judgment is *de novo*, applying the same standard as the trial court. *Smith*, 639 So.2d 730. Accordingly, we undertake a *de novo* review of the matter at bar.

### *Assignment of Error Number One*

On appeal, Mayne & Mertz argues that the joint operating agreement was null and void because it contained no lawful cause and, in the alternative, that Yuma cannot recover under the joint operating agreement because Yuma entered into the joint operating agreement in legal bad faith. We find no merit in either of these arguments.

### *Lack of Cause*

Mayne & Mertz asserts that because there was no lawful cause for the joint operating agreement, it is deemed never to have existed, or, alternatively, was a relative nullity as to Yuma.

"A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished." La.Civ.Code art. 1906. Four elements are required for formation of a contract: capacity, consent, certain object, and lawful cause. *McPherson v. Cingular Wireless, L.L.C.*, 07-462 (La.App. 3 Cir. 10/3/07),

6

967 So.2d 573. "An obligation cannot exist without a lawful cause." La.Civ.Code art. 1966.

The joint operating agreement states in its introduction that the parties to the agreement were "owners of Oil and Gas Leases and/or Oil and Gas Interests in the land [in the Romero unit]" and had "reached an agreement to explore and develop these Leases and/or Oil and Gas Interests for the production of Oil and Gas to the extent and as [provided under the terms of the joint operating agreement]." That is to say, the cause of the contract was to join all the parties to the joint operating agreement in an effort to develop the oil and gas opportunities under the Romero unit.

Mayne & Mertz asserts that because Yuma did not own a valid oil and gas lease at the time the joint operating agreement was entered into, no cause to enter into a contract with Yuma existed. However, this argument ignores the very language of Section IV(B)(1) of the joint operating agreement, which clearly contemplates the possibility that one or more of those entering into the joint operating agreement might have title problems and provides for the consequences thereof. That section reads as follows:

> B. Loss or Failure of Title:
>
> 1. Failure of Title: Should any Oil and Gas Interest or Oil and Gas Lease be lost through failure of title, which results in a reduction of interest from that shown of Exhibit "A," the party credited with contributing the affected Lease or Interest (including, if applicable, a successor in interest to such party) shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining Oil and Gas Leases and Interests; and,
>
> (a) The party credited with contributing the Oil and Gas Lease or Interest affected by the title failure (including, if applicable, a successor in interest to such party) shall bear alone the entire loss and it

shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have previously paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;

(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the Lease or Interest which has failed, but the interests of the parties contained on Exhibit "A" shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose Lease or Interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the Lease or Interest failed;

(c) If the proportionate interest of the other parties hereto in any producing well previously drilled on the Contract Area is increased by reason of the title failure, the party who bore the costs incurred in connection with such well attributable to the Lease or Interest which has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well attributable to such failed Lease or Interest;

(d) Should any person not a party to this agreement, who is determined to be the owner of any Lease or Interest which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;

(e) Any liability to account to a person not a party to this agreement for prior production of Oil and Gas which arises by reason of title failure shall be borne severally by each party (including a predecessor to a current party) who received production for which such accounting is required based on the amount of such production received, and each such party shall severally indemnify, defend and hold harmless all other parties hereto for any such liability to account;

(f) No charge shall be made to the joint account for legal expenses, fees or salaries in connection with the defense of the Lease or Interest claimed to have failed, but if the party contributing such Lease or Interest hereto elects to defend its title it shall bear all expenses in connection therewith; and

(g) If any party is given credit on Exhibit "A" to a Lease or Interest which is limited solely to ownership of an interest in the wellbore of any well or wells and the production therefrom, such party's absence of interest in the remainder of the Contract Area shall be

8

considered a Failure of Title as to such remaining Contract Area unless that absence of interest is reflected on Exhibit "A."

In other words, execution of the joint operating agreement was contingent upon assertion of title and took into consideration the possibility that title defects might arise in the future. Given the specific language of the joint operating agreement, we find no merit in Mayne & Mertz's argument that there was no cause for entering into a contract with Yuma.

Further, we find no merit in Mayne & Mertz's assertion that the cause of the joint operating agreement is unlawful. Louisiana Civil Code Article 1968 provides that "[t]he cause of an obligation is unlawful when the enforcement of the obligation would produce a result prohibited by law or against public policy." Mayne & Mertz argues that enforcing the joint operating agreement as written allows Yuma and Chalkley to unjustly enrich themselves at the expense of the actual landowners and their lessee without any compensation, and, therefore, the cause is unlawful or against public policy. However, the joint operating agreement places the burden of the failure of title evenly, providing that there shall be no retroactive adjustments of revenues received *or of expenses incurred.* That is to say, had the Romero well not been a producer, Article IV(B)(1)(b) of the joint operating agreement would have prevented Yuma from recovering the expenses it incurred before the determination that its title was flawed. Given that all the parties assumed a substantial and mutual risk on the issue of title failure, we conclude that the cause of the joint operating agreement was not prohibited by law or against public policy.

### *Bad Faith*

Finally, Mayne & Mertz asserts that Yuma entered into the joint operating agreement in bad faith. Essentially, Mayne & Mertz argues that its consent was

vitiated by Yuma's fraud in representing that Yuma had leases to a property that Yuma knew, or should have known, its lessor did not own.

Louisiana Civil Code Article 1953 defines fraud as "a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction." This court has held that:

> [I]n order to succeed on an action for fraud against a party to a contract, three elements must be proven:
>
> > (1) a misrepresentation, suppression, or omission of true information; (2) the intent to obtain an unjust advantage or to cause damage or inconvenience to another; and (3) the error induced by a fraudulent act must relate to a circumstance substantially influencing the victim's consent to (a cause of) the contract.

*Curtis v. Blue Cross Blue Shield of La.*, 07-782, p. 12 (La.App. 3 Cir. 12/12/07), 971 So.2d 1249, 1256 (citations omitted).

Although summary judgment is a favored procedure, it is "usually inappropriate in cases requiring a judicial determination of subjective facts, such as motive, intent, good faith, or knowledge." *Greer v. Dresser Indus., Inc.*, 98-129, p. 4 (La.App. 3 Cir. 7/1/98), 715 So.2d 1235, 1237.

Yuma was the movant in the motion for summary judgment, but at trial Mayne & Mertz would bear the burden of proving that its consent to the joint operating agreement was vitiated by Yuma's fraud. Thus, Yuma had the initial burden of pointing out an absence of factual support for Mayne & Mertz's allegation of fraud. To meet this burden, Yuma was not required to provide documents to support this position; its only obligation was to point out to the trial court that Mayne & Mertz would be unable to bear its burden of proving fraud at trial. *See Samaha v. Rua*, 07-1726 (La. 2/26/08), 977 So.2d 880. Once Yuma met its initial burden, in order to

establish a genuine issue of material fact Mayne & Mertz was obliged to produce factual support sufficient to establish that it would be able to satisfy its evidentiary burden of proof at trial. *Id.* In support of its own motion for summary judgment, and in opposition to Yuma's motion, Mayne & Mertz introduced the following documents that it alleged established Yuma's knowledge that Sweet Lake did not have good title to the mineral rights it purported to lease:

> The March 29, 2005 lease of oil and gas rights from Sweet Lake to Yuma, on a total of 84.0360 acres, including the 2.0604 acres that were in the Romero unit;

> The 1928 sale of land from North American Land Company, Inc. to Sweet Lake;

> The 1907 sale of land from Indian Bayou Canal Company, Ltd. to The North American Land and Timber Company, Inc.; and

> The 1902 sale of land from Orange Land Company, Ltd. to Indian Bayou Canal Company, Ltd.

Mayne & Mertz argues that examination of the 1928 deed of sale reveals that Sweet Lake purchased only a right of way over the disputed tracts. Thus, because Sweet Lake did not obtain ownership of the land, it had no mineral rights to transfer to Yuma.

While these documents establish failure of title, without more, these leases and deeds are insufficient as a matter of law to establish that there was a genuine issue of material fact whether Yuma misrepresented, suppressed, or omitted true information.

Mayne & Mertz also argues that Yuma and its lessor were engaged in collusion and that this was evidence of fraud. In support of this argument, Mayne & Mertz offered the following:

> On August 17, 2004, The Sweet Lake Land and Oil Company, Inc. was merged into Chalkley Limited Liability Company and became "The Sweet Lake Land & Oil Company, L.L.C."

On March 29, 2005, and again on May 1, 2006, The Sweet Lake Land & Oil Company, L.L.C., leased the oil, gas, and mineral rights over the disputed tract to Yuma.

At some time prior to August 25, 2008, Yuma assigned one quarter of its interests in the Romero unit to "The Chalkley Exploration Group, L.L.C."[3]

However, as the trial court noted, "Chalkley Limited Liability Company," with whom Sweet Lake had earlier merged, and "The Chalkley Exploration Group, L.L.C.," to whom Yuma transferred one quarter of its interest in the Romero unit, are legally separate entities, and this does not suffice to create a material issue of fact regarding collusion.

We find no merit in this assignment of error.

### Assignment of Error Number Two

In its second assignment of error, Mayne & Mertz asserts that the trial court committed legal error in its interpretation of the joint operating agreement and that Yuma is not entitled to the disputed revenues.

> Questions of contractual interpretation are questions of law which are subject to a *de novo* standard of review. Contracts have the force of law between the parties, and the courts are bound to interpret them according to the common intent of the parties. La.Civ.Code arts. 1983 and 2045. If the words of the contract are clear, unambiguous, and lead to no absurd consequences, the court need not look beyond the contract language to determine the true intent of the parties. La.Civ.Code art. 2046. "Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La.Civ.Code art. 2050. Whether or not a contract is ambiguous is a question of law.

*Boykin v. PPG Indus., Inc.*, 08-117, pp. 4-5 (La.App. 3 Cir. 6/18/08), 987 So.2d 838, 842, *writs denied*, 08-1635, 08-1640 (La. 10/31/08), 994 So.2d 537 (citations omitted).

---

[3] The record does not include Yuma's assignment to Chalkley, but on August 25, 2008, when Yuma filed its amended petition, Yuma added Chalkley as a plaintiff, asserting that Yuma had assigned one-quarter of its interest in the Romero unit to Chalkley.

Mayne & Mertz asserts that the "shall bear the entire loss" language found in Section IV(B)(1)(a) of the joint operating agreement supports its argument that Yuma should not be allowed to recover. However, Mayne & Mertz ignores the language of Section IV(B)(1)(b) which rejects the "retroactive adjustment of expenses incurred or revenues received" in the event of title failure and provides that a party whose title fails will receive its purported share of the revenues until "it is determined finally that title failure has occurred."

Under the express language of the joint operating agreement, Yuma and its assignee, Chalkley, were entitled to continue to receive the disputed revenues until their lessor's title to the disputed tracts was finally determined to have failed. We find no error in the trial court's interpretation of the contract's language and no merit in this assignment of error.

### *Assignment of Error Number Three*

Finally, Mayne & Mertz asserts that the trial court committed legal error in awarding the disputed revenues to Yuma through October 31, 2008. We agree. The final determination of failure of title was made on October 10, 2008, when the trial court signed the unopposed summary judgment holding that Sweet Lake never had title to the disputed tracts, and not on October 31, 2008. Thus, we amend the trial court's judgment to reflect that Mayne & Mertz is obligated under the joint operating agreement to pay Yuma and Chalkley their proportionate share of revenue, less expenses, from the Romero well until October 10, 2008.

13

## DISPOSITION

We amend the trial court's judgment to reflect a cutoff date of October 10, 2008 instead of October 30, 2008, and affirm the trial court judgment as amended. We assess all costs of this appeal to Mayne & Mertz, Inc.

**AFFIRMED AS AMENDED.**